**UNITED STATES of America**

v.

**AMERICAN LINEN SUPPLY COMPANY**, Frank G. Steiner, and Jonas H. Mayer.

No. 55 C 1481.

United States District Court
N. D. Illinois.
April 11, 1956.

Earl A. Jinkinson, Bertram M. Long, Raymond C. Nordhaus, Chicago, Ill., for plaintiff.

Leo F. Tierney, Roger W. Barrett, Charles L. Stewart, Jr., Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., for defendants.

HOFFMAN, District Judge.

This is a civil action brought by the United States under the provisions of Section 4 of the Sherman Act and Section 15 of the Clayton Act, 15 U.S.C.A. §§ 4 and 25, for equitable relief against alleged violations of Section 1 of the Sherman Act and Section 3 of the Clayton Act, 15 U.S.C.A. §§ 1 and 14. The defendants are American Linen Supply Company, a Nevada corporation with principal offices in Chicago, hereafter referred to as ALSCO, Frank G. Steiner, ALSCO's president, and Jonas H. Mayer, ALSCO's vice-president. The action was originally commenced in the Eastern District of Wisconsin and was transferred, upon the defendants' motion, to this District for further proceedings.

In this Court the defendants have filed four motions now to be considered: First, a motion to dismiss the complaint for failure to state a claim upon which relief can be granted; second, a motion to dismiss the individual defendants from the action; third, a motion to require the statement of separate claims in separate counts; and fourth, a motion for a more definite statement. No answer has yet been filed by the defendants.

1. Motion to Dismiss for Failure to State a Claim.

The defendants' first motion is made under the provisions of Rule 12(b) (6) of the Federal Rules of Civil Procedure, 28 U.S.C.A., questioning the legal sufficiency of the allegations of the complaint. Broadly stated, these allegations charge the defendants with combining and conspiring, with approximately three hundred distributors not named as parties, to restrain trade and commerce in cloth and paper towel cabinets and paper towels in violation of Section 1 of the Sherman Act, and with entering into unlawful contracts, agreements and understandings with these distributors which substantially limit competition and tend to create a monopoly in paper towel cabinets and paper towels in violation of Section 3 of the Clayton Act.

More particularly, the complaint alleges that ALSCO is engaged in the business of manufacturing dispensing cabinets for cloth and paper towels, used in restaurants, stores, industrial concerns, institutions, and government agencies throughout the United States. More than 500,000 cabinets for dispensing cloth towels have been sold by ALSCO and are now in use, it is recited, and more than 275,000 of its cabinets for dispensing paper towels are alleged to have been sold and to be in use. ALSCO also distributes paper towels, manufactured both

by ALSCO and by others, and its total annual sales are stated to be in excess of $2,000,000. All of these operations are alleged to involve interstate commerce.

The defendant ALSCO, according to the complaint, is the owner of patents covering certain mechanisms in both its cloth and paper towel cabinets. The pattern of distribution described by the government depends upon the type of cabinet. The cloth cabinets produced by ALSCO are sold to a number of linen supply companies throughout the United States, and the purchaser receives what is referred to as a user license authorizing use of the patented mechanism and obliging him to pay a $1 annual royalty for the use of each cabinet purchased. Paper towel cabinets, on the other hand, are sold to linen supply companies and paper jobbers throughout the United States with separate leases of their patented mechanisms. The purchasers-lessees then install these paper towel cabinets in the stores, restaurants, institutions, and factories of their customers without cost to the customer, upon the condition that the consumer must purchase his total requirements of paper towels from the jobber installing the cabinet. These jobbers, in turn, are required to purchase their requirements of paper towels from ALSCO. Finally, it is alleged that ALSCO also operates its own linen supply companies, through which it supplies and services towel cabinets in direct dealing with consumers.

The offenses charged in the complaint fall into two classes. First, it is averred that the defendants require the jobbers through which it distributes its paper towel cabinets to purchase their total requirements of paper towels from ALSCO as a condition to their obtaining paper towel cabinets, and, in addition, require the jobbers' customers to purchase their total requirements of paper towels from the jobber making the paper towel cabinet installation. The second class of offenses charged consists of a continuing agreement, understanding, and concert of action among the defendants and the three hundred linen supply companies and paper jobbers included as co-conspirators, by the terms of which the defendants require their jobbers in both cloth and paper towel cabinets and in paper towels not to solicit any customer being served by another jobber nor to replace any cloth or paper towel cabinet installed by another jobber.

The complaint also charges that the defendants, in effectuating and carrying out these offenses, have investigated violations of the agreements, have enforced compliance, and have penalized noncompliance by compelling offending jobbers to make restitution for business taken from other jobbers, and by threatening to cancel and by cancelling ALSCO's selling, lease, or license agreements with offending jobbers. The government also complains that, by way of enforcement of the offending agreements, the defendants have compelled the paper jobbers to buy their total requirements of paper towels from ALSCO, and the jobbers' customers to buy their requirements of paper towels from the jobber who installed their cabinets.

The effect of these agreements and practices is charged to be the elimination of competition between jobbers in the lease and sale of cloth and paper towel cabinets and the sale of paper towels, and the foreclosure of other suppliers from competing for the sale of paper towels to jobbers and customers, both to the restraint of the free flow of cloth and paper towel cabinets and paper towels in interstate trade and commerce.

■■ By their motion to dismiss the complaint, the defendants have challenged the legal sufficiency of these allegations. A few general observations regarding the nature of this motion may be offered before the detailed contentions are considered. Under the provisions of Rule 12(b) (6), Federal Rules of Civil Procedure, the complaint must be upheld so long as it states a claim upon which relief can be granted. Since the promulgation of those Rules, pleadings are no longer tested against the demanding standards of the common law. No long-

**110**

er must the allegations be cast in prescribed verbal formulas. A measure of clarity and precision has been sacrificed in quest of decisions rendered without delay and upon grounds closer to the merits of the controversy. It is enough that the complaint contains a short and plain statement of the claim showing that the plaintiff is entitled to relief. Rule 8, Fed.Rules Civ.Proc. If the defendant is fairly informed of a genuine and triable claim against him, he is compelled to answer and to proceed to trial. The accepted test appears to be whether the plaintiff would be entitled to recover upon any state of facts which might be proved in support of the allegations. See Mullen v. Fitz Simons & Connell Dredge & Dock Co., 7 Cir., 1949, 172 F.2d 601 certiorari denied, 1949, 337 U.S. 959, 69 S.Ct. 1534, 93 L.Ed. 1758. If a liberal reading discloses that, at least by general statement, the plaintiff has charged every element necessary to a recovery, summary dismissal is not justified. United States v. Employing Plasterers Association of Chicago, 1954, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618.

*The Tying Arrangements.* We turn first to the charge that the defendants have required their jobbers, as a condition to obtaining paper towel cabinets containing patented mechanisms, to purchase their total requirements of paper towels from ALSCO, and that the jobbers' customers are required to purchase their requirements of paper towels from the jobber who installed the cabinet. The government takes the position that by tying the sale or lease of towel cabinets to the sale of paper towels, the defendants have offended the prohibitions of Section 3 of the Clayton Act, 15 U.S. C.A. § 14, 38 Stat. 731, as amended. That section provides in part:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, * * * on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

The plain meaning of these words strongly implies the illegality of the practices charged against the defendants. The section reflects a legislative judgment that clauses tying the sale of one product to the sale of another seldom serve any legitimate business purpose; they can usually be explained only as attempts to exert the leverage of a monopolistic market position in one product, and to extend it to another product by excluding competitors. See Standard Oil Co. of California v. United States, 1949, 337 U.S. 293, 305–306, 69 S.Ct. 1051, 93 L.Ed. 1371. Under the express provisions of the statute, the fact that the tying product is patented does not justify use of the tying device. The inherent tendency toward actual restraint of trade and monopolization which tying clauses import was thought to justify specific prohibition of their use without resort to the tests of reasonableness. Assuming for the moment that the requisite effect upon interstate commerce is averred, the allegations that the defendants have tied the sales of paper towels to the sale or lease of patented paper towel cabinets are sufficient to charge a violation of the antitrust laws and to sustain the complaint against the motion to dismiss.

The defendants rest their attack upon the legal sufficiency of this charge wholly upon the decision of the Supreme Court in Federal Trade Commission v. Sinclair Refining Co., 1923, 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746. There the alleged restriction consisted of the requirement that pumps for dispensing gasoline leased by the defendant should be used

only to dispense the defendant's gasoline, to the exclusion of competing brands. But the lessee of the pump remained free, under the facts stated in the opinion, to install other pumps to dispense other brands, and no promise was exacted from the ultimate customer to limit his choice. In the Court's view, the arrangement merely protected the goodwill of the lessor's brand from debasement of its consumer appeal by the sale of inferior gasoline. Upon consideration of the full record, the Supreme Court affirmed the judgment of the Court of Appeals which in turn had set aside an order of the Federal Trade Commission prohibiting the use of such leasing arrangements.

The Sinclair decision has been repeatedly distinguished by the Supreme Court in subsequent cases, and it is readily distinguishable here. The Sinclair case was decided upon a completed record after a full hearing; it is not authority for dismissing the naked complaint at the pleading stage. The factual setting of the restraint there involved also serves to differentiate this restriction in its effect upon the ultimate consumer. It is one thing to limit the customer to Sinclair gasoline if he chooses to pull up to a Sinclair pump, and to oblige him to select another pump if he desires another brand; it is quite another thing to extract from the customer his promise that he will buy only ALSCO towels if an ALSCO towel cabinet is installed in his establishment. Finally, the considerations of preserving good will that justified the Sinclair leasing arrangements are not universally applicable. The goodwill justification has been expressly rejected by the Supreme Court in two subsequent decisions in analogous circumstances. In International Business Machines Corp. v. United States, 1936, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1058, the Supreme Court struck down a leasing arrangement which obliged the lessees of I. B. M. machines to use only I. B. M. punch cards. The Court rejected the argument that protection of the lessor's goodwill required exclusive use of I. B. M. punch cards for accurate operation of the machines' delicate mechanisms, since adequate safeguards could be found in reasonable specifications for the cards to be used. Similarly, in International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, the Court invalidated contractual agreements which required the lessee of certain patented machines for dissolving rock salt in brine solutions and for injecting salt tablets into foods being canned to use only the lessor's unpatented salt. The defendant's attempts to justify the restriction as a reasonable protection of goodwill were unsuccessful. Whether the paper towels supplied by ALSCO enjoy a goodwill that can be preserved only if they are dispensed exclusively through ALSCO cabinets, or whether, as the government contends, paper towels are regarded by the consumer as fungible, are questions to be decided upon evidence and not upon pleadings.

The question remains whether the complaint sufficiently sets forth the requisite effect of these tying arrangements upon interstate commerce, that is, whether their effect "may be to substantially lessen competition or tend to create a monopoly in any line of commerce" within the meaning of Section 3 of the Clayton Act. In its most recent pronouncement on the subject, the Supreme Court summarized the test in this way:

"* * * From the 'tying' cases a perceptible pattern of illegality emerges: When the seller enjoys a monopolistic position in the market for the 'tying' product, *or* if a substantial volume of commerce in the 'tied' product is restrained, a tying arrangement violates the narrower standards expressed in § 3 of the Clayton Act because from either factor the requisite potential lessening of competition is inferred." Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, at pages 608–609, 73 S.Ct. 872, at page 880, 97 L.Ed. 1277.

██ Measured against this standard, the allegations of the complaint are sufficient to withstand the motion to dis-

miss. The "tying" products, that is, the paper towel cabinets, are subject to patents covering their mechanisms. In the Times-Picayune case, supra, the Court observed, regarding the International Salt decision, that "The patents on their face conferred monopolistic, albeit lawful, market control, * * *." 345 U.S. at page 608, 73 S.Ct. at page 880. And in Standard Oil of California v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, the Court remarked, "A patent, moreover, although in fact there may be many competing substitutes for the patented article, is at least prima facie evidence of such [market] control." 337 U.S. at page 307, 69 S.Ct. at page 1059. *Prima facie* or *per se*, a patent covering the tying product supplies the monopolistic position in the market which subjects the arrangement to the prohibitions of the Clayton Act. It is unnecessary to decide upon this motion whether the presumption of market control may be rebutted by a showing that in fact the patent is so narrow that it carries no substantial monopolistic power. It is enough to support the complaint that a patented tying product raises a presumption of dominance.

■■ Although the government relies principally upon Section 3 of the Clayton Act to establish the illegality of the defendants' tying arrangements, it may be added that the complaint also adequately states an offense under Section 1 of the Sherman Act. Because it is unreasonable to restrain trade by foreclosing competitors from any substantial market, contracts tying the sales of a patented product to the sales of an unpatented product are condemned by the Sherman Act as well as by the Clayton Act. The difference in the elements necessary to establish an offense under the two provisions lies primarily in the effect upon commerce to be proved. In Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277, the Supreme Court stated that the Clayton Act is infringed whenever the supplier "enjoys a monopolistic position in the market for the 'tying'

product, *or* if a substantial volume of commerce in the 'tied' product is restrained * * * [while] a tying arrangement is banned by § 1 of the Sherman Act whenever *both* conditions are met." 345 U.S. at pages 608–609, 73 S. Ct. at page 880. As previously noted, ALSCO's patents supply the requisite monopolistic position for the tying product, that is, the towel cabinets; the Sherman Act is violated if in addition a substantial volume of commerce in the tied product, paper towels, is restrained. The complaint offers no figures showing the relative share of the paper towel market occupied by ALSCO. But it does state that at the time the complaint was filed the defendants had approximately 275,000 of their paper towel cabinets installed and in use, and were selling paper towels at the rate of approximately 340,000 cases per year at a price of $7 per case. For purposes of a pleading motion, it cannot be said that sales in the amount of two million dollars per year could not constitute a "substantial volume of commerce" in paper towels.

*The Raiding Prohibitions.* The government also objects to the provision of ALSCO's agreements with its jobbers by which the jobbers handling either cloth or paper towel cabinets are allegedly required to agree: (1) not to solicit any customer being served by another jobber; and (2) not to replace cloth or paper towel cabinets which have been installed in any place of business by another jobber. The defendants support these provisions as a reasonable exercise of the patent rights.

■ The grant of a patent confers a limited monopoly, and within those limits creates an exception to the antitrust laws. But the patentee can claim nothing beyond the rights granted; he must observe the boundaries of the monopoly awarded him. The patent confers no immunity when it is used as an instrument of monopoly power beyond its strict confines. Thus it is well settled "that where a patentee makes the patented article, and sells it, he can exercise no future control over what the pur-

chaser may wish to do with the article after his purchase." United States v. General Electric Co., 1926, 272 U.S. 476, at page 489, 47 S.Ct. 192, at page 196, 71 L.Ed. 362. After the patentee has relinquished his interest in the patented article by selling it, the purchaser is free to resell it without regard to any restrictions on the resale price or on the territory of resale which the patentee has sought to impose. See Boston Store of Chicago v. American Graphophone Co., 1918, 246 U.S. 8, 38 S.Ct. 257, 62 L.Ed. 551; Keeler v. Standard Folding Bed Co., 1895, 157 U.S. 659, 15 S.Ct. 738, 39 L.Ed. 848. Similarly, the monopoly must be carefully limited to the subject of the patent. A combination of components may not be subjected to monopolistic restrictions because some one of the components is patented if the remaining parts are not. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 384–385, 68 S.Ct. 525, 92 L.Ed. 746.

 Upon these general principles the government's complaint is sufficient to justify a trial on the merits of the claim relating to the prohibition upon jobbers' raiding each other for customers. Both types of towel cabinets are sold by ALSCO to the jobbers, with the patent mechanisms covered by a user license for cloth towel cabinets and by a lease in the case of paper towel cabinets. Whether these transactions are so far equivalent to outright sale as to put the subsequent use of the cabinets beyond ALSCO's control is a question appropriate for decision after a full trial, and not for resolution upon the allegations of the complaint. In the same vein, it is alleged that only certain mechanisms in ALSCO's cabinets are patented, and it is impossible to say upon the pleading alone whether these mechanisms are so significant as to justify ALSCO's restrictions upon the use of the cabinets as a whole, or whether any such restrictions must fall as an attempt to extend the monopoly beyond the scope of the patent. Either upon the ground that the cabinets have been sold so as to put

them beyond ALSCO's power, or upon the ground that the patent covering mechanical parts cannot support restrictions on the use of the whole cabinet, the government is entitled to go to trial on this branch of the case.

 Apart from these grounds, and even if the transactions are regarded not as sales but as licenses under the patents, it appears that the complaint sufficiently states a claim under Section 1 of the Sherman Act. The defendants rely principally upon United States v. General Electric Co., 1926, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362, as authority for the legality of the clauses preventing competition among the jobbers. There it was held that the patentee, to secure the reward granted to him, might properly fix the price at which a licensee should sell the patented articles manufactured under the license, in order to protect the patentee's profits derived from his continued manufacture of the same articles. To the same effect is General Talking Pictures Corp. v. Western Electric Co., 1938, 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81, where a provision of a license for manufacture of the patented article limited the sales of the licensee to a specified field of use. The licensee's sale in a prohibited field, and in competition in the area reserved by the patentee, was held to constitute an infringement of the patent. These cases go no further than to establish that in granting licenses, a patentee may impose reasonable restrictions to obtain the benefit of his patent. As stated in the General Electric case, supra, "the patentee may grant a license to make, use, and vend articles under the specifications of his patent for any royalty, or upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure." 272 U.S. at page 489, 47 S.Ct. at page 196.

 But the permissible scope of the restrictions which may be imposed is coextensive with the legitimate interest of the patentee. Restraints upon competition imposed for the benefit of the

licensee, and not for the protection of the patentee, must be measured by a different standard. If competition is foreclosed among licensees operating at a different market level from the patentee, it is not the patentee who is protected from competition, and the antitrust laws, not the patent laws, control. In Ethyl Gasoline Corp. v. United States, 1940, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852, the defendant was the owner of a patent for ethyl fluid and of a separate patent covering the process of mixing the fluid with petroleum products to make motor fuel. Defendant sold its fluid to certain refiners and licensed them under the process patent, without royalty, to produce the motor fuel mixture. As an incident of these licenses, the defendant required the licensee-refiners to sell only to other licensed refiners and jobbers. The jobbers in turn were bound to re-sell only at fixed prices and were subjected to limitations upon their competition with each other. The Court held these arrangements unlawful under Section 1 of the Sherman Act. The patent covering the ethyl fluid, it was held, was exhausted when the fluid was sold to the refiners and could not thereafter justify any restraints upon commerce. The patent covering the mixing process did not support the restrictions upon the jobbers because the restrictions benefited the licensees and not the patentee. On this point the Court remarked:

"* * * Such benefits as result from control over the marketing of the treated fuel by the jobbers accrues primarily to the refiners and indirectly to appellant [defendant], only in the enjoyment of its monopoly of the fluid secured under another patent. The licensing conditions are thus not used as a means of stimulating the commercial development and financial returns of the patented invention which is licensed, but for the commercial development of the business of the refiners and the exploitation of a second patent monopoly not embraced in the first. * * *" 309 U.S. 436, at page 459, 60 S.Ct. 618, at page 626.

The principle that competition between licensees may not be limited except in the interests of the patentee also finds support in United States v. Besser Mfg. Co., D.C.E.D.Mich.1951, 96 F.Supp. 304, affirmed, 1952, 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063, where the Court struck down an attempt to protect a licensee from competition with other licensees by giving him a veto power in the selection of other licensees. The decisions invalidating attempts to fix the prices at which patented articles may be re-sold by the purchaser rest upon the same principle; that the patent monopoly does not authorize any restraint upon competition not calculated to secure for the patentee the reward for his invention. See, for example, United States v. Univis Lens Co., 1942, 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408; Boston Store of Chicago v. American Graphophone Co., 1918, 246 U.S. 8, 38 S.Ct. 257, 62 L.Ed. 551.

Here the defendants, as an incident of the user licenses for patented parts of cloth towel cabinets and of the lease of patented parts of the paper towel cabinets, have prohibited their jobbers from competing with each other by seeking the custom of consumers being served by other jobbers. Under these arrangements, no jobber may replace a cabinet installed by another jobber. The government argues that these limitations serve no legitimate interest of ALSCO and serve only to provide mutual protection from competition for the jobbers. Since ALSCO's rents and royalties will continue to be paid whether the customer is served by one jobber or another, the government submits that no justification from the patentee's viewpoint can be offered. The defendants, on the other hand, argue that what will serve ALSCO's interests is a matter of business judgment, to be left to ALSCO's decision. This controversy can be resolved only through a trial.

The defendants also argue in support of their motion to dismiss the complaint that the conduct charged by the government is the activity of a single

trader, and that no conspiracy has been set forth to support the claim that the Sherman Act has been violated. In the defendants' view, the restrictions contained in ALSCO's agreements with its jobbers, forbidding raiding for customers between the jobbers, were imposed upon the jobbers as passive parties, without their concurrence or participation. The argument lacks merit. In the first place, it should be noted that Section 1 of the Sherman Act condemns restraints of trade whether effected by means of contracts or by means of a conspiracy. The contractual arrangements of a seller with his customers may constitute an offense under Section 1 without the element of conspiracy. See, for example, International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20. Moreover, the complaint clearly charges that ALSCO operates as a jobber in its operation of linen supply companies. To whatever extent this may prove to be true, the agreements prohibiting one jobber from taking the customers of another are horizontal combinations in restraint of trade, made between units competing at the same market level. Finally, it is not essential to the existence of a conspiracy that there be actual agreement directly between the competing jobbers. The arrangement charged in the complaint, viewed as a whole, is the functional equivalent of a horizontal agreement to allocate customers, condemned as a violation, *per se*, of the Sherman Act in cases such as United States v. Addyston Pipe & Steel Co., 6 Cir., 1898, 85 F. 271, and Las Vegas Merchant Plumbers Association v. United States, 9 Cir., 1954, 210 F.2d 732. That the arrangement here involved has been effectuated through the instrumentality of ALSCO as the common seller and not by direct agreement is unimportant so long as the jobbers have acted in concert in pursuance of the same objective. If, as the government argues, the restrictions are unrelated to any legitimate interest of ALSCO in the exercise of its patent rights, the total scheme could be found to constitute an over-all conspiracy under Section 1 of the Sher-

man Act. Ethyl Gasoline Corp. v. United States, 1940, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; Dr. Miles Medical Co. v. John D. Park & Sons Co., 1911, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502.

It follows from what has been said that the defendants' motion to dismiss the complaint for failure to state a claim upon which relief can be granted must be denied. In the ordinary case such a ruling can appropriately be made by summary order, without a detailed discussion of reasons. A fuller consideration has seemed to the court to be warranted in this case, to assist in clarifying the points in controversy and to facilitate a speedier final disposition.

2. Motion to Dismiss the Individual
 Defendants.

Frank G. Steiner and Jonas H. Mayer, ALSCO's president and vice-president respectively, have been joined as defendants in this action. The complaint charges generally that the acts alleged to have been done by the corporate defendant ALSCO were authorized, ordered, or done by these defendants and other corporate officers and agents. The offenses charged are alleged to have been committed by the "defendants" without differentiation between the corporation and the individuals. But no acts are specifically charged to have been done by the individual defendants in their individual capacities. So far as appears from the complaint, their participation in the wrongs complained of was limited to activity in behalf of the corporation.

Upon this basis, the defendants Steiner and Mayer have moved for the dismissal of the action as to them, upon the ground that no relief can be granted against them for their conduct in the capacity of ALSCO's officers and agents. Assuming that nothing could be offered at a trial to show any misconduct on their part beyond the scope of their efforts in ALSCO's behalf, it does not follow that they are not proper parties to the litigation. Under the provisions of Rule 65(d), Fed.Rules Civ.Proc., the individuals as corporate officers would properly

be bound by any injunction that might be entered. In addition to an injunction, the complaint also requests declaratory relief, establishing the illegality of the practices described. In either aspect, the complaint sets forth a claim upon which some form of relief could be granted against the individual defendants.

The defendants rely upon Hartford-Empire Co. v. United States, 1945, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322, as supporting their motion. There the Supreme Court, in the exercise of its equity powers, deleted the names of the individual defendants from the terms of an antitrust decree. The Court observed that the individuals had participated in the violations only in their capacities as officers and agents of the corporate defendants. Noting that under the provisions of Rule 65, Fed.Rules Civ.Proc., the individuals would be bound by an injunction naming only the corporations in all their activities on behalf of these corporations, the Court saw no reason to subject these individuals to the risks and harassment of an injunction if they should subsequently sever their relations with the corporate defendants and engage in a different line of activity. The decision, and the lower court cases that have followed it, establish that relief against individual defendants who have committed violations only in their capacities as corporate agents or officers should be enjoined only in that capacity; there is no suggestion that no relief can be given against individuals so situated.

As the government points out, in the Hartford-Empire case the Court held that the action should be dismissed only as against the individual defendants who had not participated in any capacity in the wrongdoing. Those defendants who had participated as corporate officers or agents in the violations were not held to be entitled to dismissal of the action against them. The holding is only that the relief to be granted against them must be limited. The fact that the scope of possible relief against ALSCO may be broader than the relief which could be

granted against its officers does not avail the plaintiffs. Rule 20, Fed.Rules Civ.Proc., provides in part, "A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given * * * against one or more defendants according to their respective liabilities."

It does not appear that the individual defendants will be unduly prejudiced by being retained as formal parties to the record. Whether joined or not, they will be subject to any decree which may be entered against ALSCO for so long as they maintain their connections with it. The deposition and discovery provisions of the Federal Rules apply equally to parties and to officers and agents of corporate parties. See, for example, Rules 33, 37(b), and 37(d), Fed.Rules Civ.Proc. Similarly, the government may call the officer or agent of a corporate defendant to the stand for examination as an adverse witness, under Rule 43(b), whether or not the officer or agent is joined as a party to the action.

The motion to dismiss the action as to the defendants Steiner and Mayer is accordingly denied.

3. Motion to Require Separate Statement of Claims.

The defendants have moved for an order requiring the plaintiff to state its claim made under Section 3 of the Clayton Act in a separate count from its claim under Section 1 of the Sherman Act. In so moving, they invoke the second sentence of Rule 10(b), Fed.Rules Civ.Proc., which reads:

"* * * Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth."

No motion for the enforcement of this admonition is provided by the Federal Rules unless it is the motion for a more definite statement under Rule 12(e), which would serve in those cases where

the failure to separate claims into separate counts renders the complaint so vague and ambiguous that the defendant cannot reasonably be compelled to frame an answer. Nevertheless, for purposes of disposing of the motion, it will be assumed that the motion is sanctioned by the implications of the quoted portions of Rule 10(b).

 Modern federal practice does not oblige a pleader to repeat a statement of a single factual transaction as many times as he has legal theories to support his claims. If a single transaction or occurrence gives rise to several claims, they may properly be pleaded in a single count. Here the alleged violations of the Clayton Act and the Sherman Act are based upon the same course of dealing. Indeed, the claims regarding tying contracts are legally sufficient under both the Sherman and Clayton Acts, upon precisely the same facts. It does not appear that separate statements in two counts would promote clarity or "facilitate the clear presentation of the matters set forth" as required by Rule 10(b). The able brief submitted in support of the defendants' motion to dismiss indicates that it is possible to divine the nature of the plaintiff's claims upon the complaint as it stands. To require the plaintiff to recast the allegations in another form would serve only to delay the final disposition of the dispute.

The motion is denied.

4. Motion for More Definite Statement.

The defendants have moved under Rule 12(e), Fed.Rules Civ.Proc., for a more definite statement of certain of the allegations of the complaint. Under that Rule, the motion is to be granted only if the complaint is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." The Rule as originally promulgated also countenanced a motion for a bill of particulars where necessary to the defendant's preparation for trial. But the bill of particulars was abolished in the 1946 revision of the Rules in the belief that its utility was outweighed by the delay and wasted effort that attended its use. Under the present practice, information necessary to preparation for trial is to be elicited through the use of the discovery techniques made available by the Rules. The motion for a more definite statement is confined to the limited function of making it possible for the defendant to plead. See Rudolph Wurlitzer Co. v. Atol, 12 D.C.D.Minn.1952, 12 F.R.D. 173.

 The degree of particularity with which a pleader must state his claim varies, of course, with the nature of the cause of action asserted and with the relevance of the allegations to the merits of the claim. Specificity in the degree required to the reception of testimony at the trial is neither desirable nor required at the pleading stage. So long as the defendant is reasonably informed of the plaintiff's claim, so that he can frame an adequate answer, the complaint is sufficient against a motion for a more definite statement.

 The matters upon which the defendants seek more definite information by this motion all relate to questions of evidence which will be relevant at trial. But they do not rise to a level of significance at the pleading stage, nor do they affect the legal sufficiency of the complaint. It is of course no answer to the motion that the matters of fact to be disclosed are within the defendants' knowledge, since the defendants are entitled to be informed about what the government contends the facts to be. But the appropriate means for learning these matters is the use of requests to admit under Rule 36 and of interrogatories under Rule 33, and not the inclusion of detail in the complaint. The questions of the exact scope of participation of the individual defendants in the arrangements complained of, of the details of the unlawful agreements alleged, and of the precise nature of the conspiracy charged need not be answered by the complaint to enable the defendants to prepare a responsive pleading.

The motion for a more definite statement will be denied.

Minute orders have been entered in conformity with the views herein expressed and an order has also been entered directing the several defendants to file their respective answers to the complaint on or before May 1, 1956.