328 F.2d 505
 BOYD CALLAN, INC., B. D. McMillan, Inc. and Trinity
Universal Insurance Company, Appellants,
v.
UNITED STATES for the Use of STEVES INDUSTRIES, INC., d/b/a
Ingram Equipment Company, Appellee.
 No. 20174.
 United States Court of Appeals Fifth Circuit.
 Feb. 27, 1964, Rehearing Denied April 27, 1964.
 
 Richard U. Simon and Simon & Simon, Forth Worth, Tex., for appellants.
 W. W. Fowlkes, San Antonio, Tex., for appellee.
 Before TUTTLE, Chief Judge, and RIVES and MOORE,* Circuit Judges.
 RIVES, Circuit Judge.
 
 
 1
 Boyd Callan, Inc., hereafter Callan, entered into a contract with the United States for improving the channel of the San Antonio River near San Antonio, Texas, and, in accordance with the requirements of the Miller Act,[1] executed a payment bond with Trinity Universal Insurance Company, hereafter Trinity, as surety 'for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract.'[2] B. D. McMillan, Inc., hereafter McMillan, was a subcontractor on the project. Use plaintiff, Steves Industries, Inc., d/b/a Ingram Equipment Company, hereafter Ingram, recovered judgment against Callan and Trinity for $4,946.25; against Callan, McMillan and Trinity for $19,960.97 for materials supplied on open account; and against Callan, McMillan and Trinity for $15,954.36 for unpaid rental for equipment used in the prosecution of the work. The questions presented on appeal are: (1) whether the district court erred in referring all of the issues except attorneys' fees to a special master; (2) whether the rentals were covered by the bond, or were payments on the purchase of the equipment; (3) whether certain expensive and durable items supplied on open account were covered by the bond; (4) whether attorneys' fees were recoverable on the bond; (5) whether interest was properly computed.
 
 
 2
 1. Special Master.
 
 
 3
 The district court, on its own motion, and contrary to the expressed wishes of all of the parties, appointed a Special Master 'to hear the parties and their evidence and make and file a report, including findings of fact and conclusions of law * * *, containing his findings on all of the issues except attorneys fees, with a view to aiding the jury.' Over the objections of the defendants, the master's findings of fact were admitted in evidence and read to the jury.
 
 
 4
 At the time of referring the issues to the master the district court found 'that the trial of this case will involve a consideration of complicated issues and that a jury will have difficulty in passing upon the issues involved.'
 
 
 5
 At that time, pretrial hearings had resulted in stipulations that the items covered by about 235 invoices were within the coverage of the bond. As to the items covered by the remaining 75 invoices, the defendants were contesting coverage. The defendants' attorney assured the court that 'the only jury question would be a very minor one' and 'I wish you wouldn't (appoint a master). I really think we can try the case in three days.' Nevertheless, at that time, it may not have been an abuse of discretion for the court to anticipate that the issues would be too complicated for the jury to handle without assistance. See Rule 53, Fed.R.Civ.P. When the master filed his report, he made no effort to analyze or audit the invoiced items, but, treating them all together, made findings that they were all covered by the bond. By that time it was clear that the issues were not too complicated for the jury to decide.
 
 
 6
 The jury's answers to special questions virtually tracked the master's findings. We cannot be sure that its verdict would have been the same if not influenced by the findings of the master. The main question, common to most of the items, was whether they were consumed on the job or might reasonably be expected to be consumed on the job. We cannot say that the master, a competent lawyer, was any better qualified to judge that issue than was a jury. Likewise, the issues of whether the contract, captioned 'Lease Contract,' was actually a sales contract and whether the so-called rentals were payments on the purchase price of the equipment presented questions of law and fact for the court and jury, which should not have been referred to a master.
 
 
 7
 Some authorities treat a reference to a master as no invasion, or, at most, a minor invasion of a jury's province, e.g.: 'Since the report of the master is merely evidence, which the jury is free to disregard, a reference in such a case carries no danger that the master will displace the court in making the decision, and the complicated nature of the issues may justify the expense and delay of a reference.' 2B Barron and Holtzoff Federal Practice and Procedure 1162, p. 580.
 
 
 8
 A more realistic view is taken by the Supreme Court and followed by this Court. As last stated by the Supreme Court:
 
 
 9
 'Even this limited inroad upon the right to trial by jury "should seldom be made, and if at all only when unusual circumstances exist." La Buy v. Howes Leather Co., 352 U.S. 249, 258, (77 S.Ct. 309, 1 L.Ed.2d 290.) See also In re Watkins, 5 Cir., 271 F.2d 771, (76 A.L.R.2d 1113.)'
 
 
 10
 Dairy Queen, Inc. v. Wood, 1962, 369 U.S. 469, 478, n. 18, 82 S.Ct. 894, 900, 8 L.Ed.2d 44.
 
 
 11
 We hold that the district court erred in admitting the master's findings as evidence of the matters found, and in permitting them to be read to the jury.
 
 
 12
 2. Rentals of Equipment.
 
 
 13
 By contracts styled 'Lease Contract,' dated August 18, 1958 and September 4, 1958, Ingram furnished to McMillan for use on the project three 'Euclid Model' scrapers powered by diesel engines. At a time when the monthly payments under these two contracts were several months past due, Callan, the prime contractor, requested that Ingram grant McMillan a reduced monthly payment for a longer period of time and offered to guarantee the payments.[3] On October 29, 1959, a new 'Lease Contract' was executed which provided: 'This lease is in renewal and extension but not in extinguishment of leases dated Aug. 18 and Sept. 4, 1958, on same equipment, and the holder of this lease is subrogated to all rights under said leases.'
 
 
 14
 The district court submitted to the jury the question of whether the parties intended the agreement to constitute a lease or a purchase of capital equipment.[4] The jury's verdict was that all of the contested items were covered by the bond, thus holding that the agreement constituted a lease. There was ample evidence to sustain that verdict. From September 1959 to March 1960, only one monthly payment of $2,800.00 was paid. There was testimony that the monthly amounts were fair for actual rental. On McMillan's books, the payments were not capitalized, but were treated as a cost of doing business. McMillan did not exercise the option to purchase, and no bill of sale was executed. The scrapers were returned to Ingram and a credit memorandum was issued for the unused portion of the rental.
 
 
 15
 There were countervailing considerations from which the jury could have concluded that the so-called 'Lease Contract' was actually a sale. If all of the monthly payments had been made, they would have totaled the agreed purchase price upon exercise of the option to purchase. The contract was recorded as a chattel mortgage. We make no effort to exhaust the circumstances from which the jury, under proper instructions from the court, might draw either inference; but hold that whether what was in form a lease contract was in effect a sales contract presented ultimately a question of fact as to the real intention of the parties. Compare Benton v. Commissioner of Internal Revenue, 5 Cir. 1952, 197 F.2d 745, 752.
 
 
 16
 Along with the 'Lease Contract' of October 29, 1959, Ingram forwarded to McMillan a letter containing computations as follows:
 
 
 17
 "Our Computations:
 
 
 18
 "Open account balance due
 through October 17, 1959 $13,287.38
"Final note payment,
 November 1, 1959 10,326.10
"Balance to purchase three
 Euclid Scrapers 44,917.87
 --------------
"Total balance due
 Ingram Equipment Company 68,531.35
 --------------
 "This total indebtedness is to be paid
 as follows per our agreement:
 
 
 19
 'Our Computations: 'This total indebtedness is to paid as follows per our agreement:
 
 
 20
 '1. A 24 month guaranteed rental payout lease contract payable at $2,800.00 per month (total time balance $67,200.00), first rental payment is due December 15, 1959 and each payment thereafter will come due on the 15th day of each successive month.
 
 
 21
 '2. The balance of $8,531.35 to be paid in two installments; the first due on November 1, 1959, second on December 1, 1959.
 
 
 22
 '3. Insurance coverage will be invoiced separately at the rate of 6cents/per $100.00/per month, on 60,000.00 (36.00 month).
 
 
 23
 'Computation of option price original lease contracts:
 
 
 24
 "Total contract price $92,000.00
"Interest from original
 date of rental through
 November 15, 1959 5,658.59
"Total Price 97,658.59
"Rentals invoiced 69,300.00
"Credit issued 16,559.28 52,740.72
 ----------------------
"Option Price 44,917.87"
 -----------
 
 
 25
 The $8,531.35 indebtedness was evidenced by a separate note which was paid. These computations and the items which they represented were matters to be considered by the jury in determining the true nature of the contract, and, if found to be a lease contract, in determining whether the $2,800.00 per month stated to be rental was more than a fair rental, and if so, what part of said $2,800.00 should be treated as rental.
 
 
 26
 3. Durable Items.
 
 
 27
 Work on the project lasted some 600 days and involved moving about four million cubic yards of dirt over a five-mile length of the San Antonio River. Except for one piece of equipment that was purchased new after the work began, all of the earth-moving equipment that was brought on the job had had prior use. There was evidence that the machinery was well maintained, and that none of the equipment into which repair and replacement items went was junked after the job ended, but that it was all in good operating condition.
 
 
 28
 The master's findings read to the jury over the defendants' objections contained statements that all of the labor, materials and repairs furnished by Ingram to Callan or to McMillan 'were necessary for the continuation and prosecution of the work to completion' and, 'at the time of such furnishing, Ingram reasonably expected that such labor, materials and repairs would be consumed or substantially consumed in the prosecution of the work.' There was no finding as to what Callan or McMillan 'reasonably expected.'
 
 
 29
 In the course of the defendants' cross-examination of Mr. St. John, the parts manager for Ingram, the district court, in the presence of the jury, announced the following ruling, to which the defendants objected:
 
 
 30
 'I think the test, I think that what the jury is going to have to decide in this case is whether or not these materials which were added or which were placed on the machinery materially added to the capital investment as a capital item. I don't think the test is whether or not that machinery was benefited by placing these materials upon it when it was not in operating condition. I think we have to consider the machinery operating and then becoming repairable and then having repairs made to determine then whether the value has been added to from the capital standpoint.'
 
 
 31
 The district court charged the jury as follows:
 
 
 32
 'The term 'labor and materials' includes labor, materials, repairs, parts, and replacements needed for the continuation and completion of the work on the San Antonio River Project, and which are generally considered as a portion of the cost of doing the job. The upkeep, repairs, maintenance, parts and replacements incident to any capital equipment are included, but capital equipment, as such, is not included because capital equipment, itself, as opposed to its upkeep, maintenance, repairs, parts and replacements, would be available for other jobs and the cost of such capital equipment would not be considered as having been consumed on the job.
 
 
 33
 'In answering the question you are instructed that the payment bond is for the protection of those furnishing labor and materials on government projects, and that ordinary maintenance and repairs are included in its coverage, as well as repairs or replacements for items which have been worn out, or used up, or consumed on the job, or which Plaintiff expected, or might reasonably have expected, to be consumed or substantially consumed in the prosecution of the work. You may also take into consideration the contractor's obligation to keep any machinery used on the project in a good condition of maintenance and repair.
 
 
 34
 'On the other hand, if you find and believe that any of the items involved are capital items, which substantially and materially add to the value of contractors' capital equipment and which Plaintiff did not reasonably expect to be consumed or substantially consumed on the project, and which would be generally available as the capital equipment for other projects, then such items are not included in the bond coverage. In this connection, you should consider the condition of the equipment when the work began, its condition after the repairs were made, and the Plaintiff's reasonable expectation with respect to its condition when the work on this particular project would be concluded.'
 
 
 35
 To this charge, the defendants objected on the ground that the test should not depend upon what the plaintiff unilaterally expected or might reasonably expect, but should be what the parties to the transaction reasonably expected. The court declined to change its charge.
 
 
 36
 We have already held that it was error to permit the master's findings to be read to the jury. We find no reversible error in the other rulings as to the recoverable items for maintenance and operation of equipment.
 
 
 37
 Appellants concede, as they must, that it is not necessary that the repair and replacement items be actually consumed while the equipment remained on the job, but insist that all parties to the transaction must have reasonably expected such consumption. Though that contention appears plausible, the appellants find no case clearly so holding but rely upon the statement of the Second Circuit in the well-reasoned case of United States for Use and Benefit of J. P. Byrne & Co. v. Fire Association of Philadelphia, 2 Cir. 1958, 260 F.2d 541, 544, that:
 
 
 38
 'At the time of the their delivery, the facts unequivocally show that both the use plaintiff and the construction company reasonably expected them to have been substantially used up in the work under the contract.'
 
 
 39
 That is clearly no more than a statement of what the facts in that case showed. That it was not meant to require proof of what the 'construction company reasonably expected' is shown in the very next sentence.
 
 
 40
 'Although many of these items may not in fact have been consumed prior to the unexpected work stoppage, there is not the slightest taint in this case of an attempt by the contractor, within the constructive knowledge of its suppliers, to build up its permanent capital investment at the surety's expense. Cf. United States v. Hercules Co., D.C.S.D.Miss., 52 F.2d 454.'
 
 
 41
 Later, the Second Circuit referred to the surety's insistence that its bond did not extend to materials which the contractor innocently or fraudulently diverted to another project, and stated:
 
 
 42
 '* * * it would be inconsistent with the preceding discussion to enlarge the holdings of past cases which have relieved the surety of his obligation only in circumstances where the supplier, at the time the materials were furnished, had constructive knowledge of the contractor's intended use of them. St. Paul-Mercury Indemnity Co. v. United States for Use of Jones, 10 Cir., 238 F.2d 917, 924-925; United States, for Use of Westinghouse Electric Supply Co. v. Fourt, D.C.W.C.Okl., 131 F.Supp. 584, 585, affirmed Fourt v. United States, for Use of Westinghouse Electric Supply Co., 10 Cir., 235 F.2d 433.' (260 F.2d at p. 545.)
 
 
 43
 Further, the reasoning, as admirably stated by the Second Circuit, is fully applicable in favor of Ingram as the furnisher of the maintenance and repair items:
 
 
 44
 '* * * the statutory bond is of value to materialmen in our credit economy only as its coverage is predictable at the time the contract for the materials is created. Businessmen look to more than the contents of their cash registers in conducting their affairs. If, because the surety's liability is held suspended until the goods are consumed, the bond has little effect on the degree of certainty with which the supplier can expect to receive the purchase price of the materials sold or to be sold under the contract, it little aids the financial position of the persons Congress sought to benefit.' (260 F.2d at p. 545.)
 
 
 45
 The Fourth Circuit in United States for Use and Benefit of Westinghouse Electric Supply Co. v. Endebrock-White Company, 1960, 275 F.2d 57, 60, stated its holding as follows:
 
 
 46
 'We hold that, in order to recover under the Miller Act, it is not required of the materialman that he prove that his materials were actually used in the prosecution of the work of the prime contract, but only that in good faith he reasonably believed that the materials were so intended.'
 
 
 47
 See also Fourt v. United States, 10 Cir. 1956, 235 F.2d 433, and cases collected in Annotation 79 A.L.R.2d at pp. 850-852.
 
 
 48
 That seems to us a sound statement of the law in accord with Judge Sibley's opinion for this Circuit in Massachusetts Bonding & Ins. Co. v. United States, 5 Cir. 1937, 88 F.2d 388, 389, 390.
 
 
 49
 4. Attorneys' Fees.
 
 
 50
 The judgment granted a recovery of $6,750.00 as attorneys' fees, and the appellee seeks additional fees for the services of its attorneys on this appeal. In United States for Use and Benefit of Caldwell Foundry & Mach. Co. v. Texas Construction Company, 5 Cir. 1955, 237 F.2d 705, we recognized that in suits under the Miller Act, the recovery of interest, costs, and attorneys' fees is governed by state law, and held that attorneys' fees were recoverable under Texas law. The appellants urge that we were mistaken as to the Texas law and rely upon F. & C. Engineering Co. v. Moore, Tex.Civ.App.1957, 300 S.W.2d 323, 327. There, in speaking of a bond guaranteeing that the contractor would promptly pay for all labor and materials furnished in the prosecution of the work under the contract, the court said:
 
 
 51
 'These attorney's fees are not recoverable as against the surety. Its obligation to pay arose from the bond sued upon and is controlled by its provisions to pay for labor and materials furnished.'
 
 
 52
 In a suit on a contractor's bond in a Capehart housing project, that case was distinguished by this Court as follows:
 
 
 53
 'Appellant cites F. & C. Engineering Company, Inc. v. Moore, Tex.Civ.App., 300 S.W.2d 323, in support of its contention that it is not liable for attorney's fees under the terms of its payment bond. In that case the bond limited the surety's liability only for labor, material and equipment. The bond in this case goes beyond that. Subparagraph 2 of Paragraph 4 provides that the surety shall be liable for such sum or sums as may be justly due claimant. The decision of the District Court as to the right of these appellees to recover attorney's fees was based upon this provision of the bond and we agree with the decision of the District Judge that appellant is liable to each appellee for a reasonable attorney's fee.' Continental Casualty Company v. United States, 5 Cir. 1962, 308 F.2d 846, 849.
 
 
 54
 In a suit on a bond under the Texas McGregor Act, taken from the Miller Act, another Court of Civil Appeals of Texas has recently held:
 
 
 55
 'Any doubt as to appellees' right to also recover attorneys' fees from Ferrier Brothers' surety is dispelled by the decision in United States for Use and Benefit of Caldwell Foundry & Mach. Co. v. Texas Construction Company, 5 Cir., 237 F.2d 705, wherein the court said * * *.' Ferrier Brothers v. Brown, Tex.Civ.App. 1962, 362 S.W.2d 181, 188.
 
 
 56
 The Miller Act bond is not limited to the payment for labor and materials, as was the bond in F. & C. Engineering Co. v. Moore, supra, but is 'for the protection of all persons supplying labor and material etc.' 40 U.S.C.A. 270a(a)(2). It must be construed liberally in order to effectuate the purpose of Congress. Illinois Surety Co. v. John Davis Co., 1917, 244 U.S. 376, 378, 37 S.Ct. 614, 61 L.Ed. 1206. Article 2226, Vernon's Civil Statutes of Texas provides for the allowance of attorneys' fees on claims for labor done and material furnished, inter alia. The Miller Act bond covers this statutory right of a person supplying labor and materials to the allowance of attorneys' fees. We adhere to our holding in United States for Use and Benefit of Caldwell Foundry & Mach. Co. v. Texas Construction Company, supra.
 
 
 57
 5. Interest.
 
 
 58
 Article 5070 of Vernon's Civil Statutes of Texas provides:
 
 
 59
 'When no specified rate of interest is agreed upon by the parties, interest at the rate of six per cent per annum shall be allowed on all written contracts ascertaining the sum payable, from and after the time when the sum is due and payable; and on all open accounts, from the first day of January after the same are made.'
 
 
 60
 The district court allowed interest on the open accounts from the first day of January after they were made, and allowed interest on the 'lease contract' from the date of demand on the surety. We think that was correct. United States for Use and Benefit of Caldwell Foundry & Mach. Co. v. Texas Construction Company, supra; Ferrier Brothers v. Brown, supra.
 
 
 61
 For the error in admitting the master's findings in evidence, the judgment is reversed and the cause remanded.
 
 
 62
 Reversed and remanded.
 
 
 
 *
 Of the Second Circuit, sitting by designation
 
 
 [1]
 40 U.S.C.A. 270a-270d
 
 
 [2]
 40 U.S.C.A. 270a(a)(2)
 
 
 [3]
 For which Callan may already have been liable under the payment bond
 
 
 [4]
 Cases holding rentals for equipment used in the prosecution of the work to be generally recoverable under a Miller Act payment bond are collected in an annotation in 79 A.L.R.2d at pp. 849, 850