**ARMSTRONG CORK COMPANY**

v.

**CONGOLEUM INDUSTRIES, INC.**

**Civ. A. No. 73–18.**

United States District Court, E. D. Pennsylvania.

June 27, 1975.

Edward W. Mullinix, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., W. Brown Morton, Jr., Morton, Bernard, Brown, Roberts & Sutherland, Washington, D. C., George L. Herr, Theodore L. Thomas, Armstrong Cork Company, Lancaster, Pa., for plaintiff.

Lewis H. Van Dusen, Jr., Patrick T. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., Eben M. Graves, Joseph D. Garon, Allan H. Bonnell, Bradley B.

Geist, Brumbaugh, Graves, Donohue & Raymond, Michael M. Maney, Sullivan & Cromwell, New York City, for defendant.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW AND ORDER

HANNUM, District Judge.

This cause tried to the Court without a jury is submitted by plaintiff, Armstrong Cork Company (hereinafter Armstrong) for a declaratory judgment that its chemically embossed foamed vinyl floor covering process and products using lauroyl peroxide do not infringe United States Letters Patents No. 3,293,094 and No. 3,293,108 (hereinafter '094 and '108 respectively) owned by defendant, Congoleum Industries, Inc., (hereinafter Congoleum), and by defendant's counter-claim that said process and products do infringe said patents.

This is the second major trial in the ongoing litigation between the parties all of which began in 1966. A procedural history of this litigation aids to understand the posture of this case and the issues raised herein.

On December 20, 1966, the '094 and '108 patents were issued to Congoleum.[1] The next day Congoleum filed a complaint on Armstrong for infringement of these patents. This was Civil Action Number 41,762 and became known, inter alia, as the benzoyl peroxide case.

After extensive discovery and a long trial, we held, on February 23, 1972, that the Congoleum patents were valid and were infringed by the Armstrong commercial process using benzoyl peroxide. Congoleum v. Armstrong, 339 F. Supp. 1036 (E.D.Pa.1972). Armstrong appealed.

Armstrong then sought and was granted a remand [2] to this Court for the sole purpose of determining whether the record should be reopened to allow additional evidence. This was formalized in

1. By assignment, Congoleum is the owner of all right, title, and interest in the patents.

2. No. 72–1510 (3rd Cir. Dec. 13, 1972).

a motion for new trial pursuant to Rule 60(b) Federal Rules of Civil Procedure. On August 16, 1973, we denied the motion. 366 F.Supp. 220 (E.D.Pa.1973). Armstrong appealed.

The appeal was held in abeyance pending trial before this Court on the reserved issue of whether Congoleum had misused the patents in suit. On October 5, 1973, we held that the patents in suit had not been misused. 366 F.Supp. 227 (E.D.Pa.1973). Armstrong appealed.

Thereafter, we entered judgment final which, *inter alia*, enjoined Armstrong from using an inhibitor such as benzoyl peroxide in its commercial process. Armstrong appealed.

The Court of Appeals affirmed in all respects on February 10, 1975, *Congoleum v. Armstrong*, 510 F.2d 334 (3rd Cir. 1975), *cert. den.*, 421 U.S. 988, 95 S.Ct. 1991, 44 L.Ed.2d 478 (1975).

Meanwhile, following our decision that Armstrong's commercial process using benzoyl peroxide infringed the patents in suit, Armstrong modified its commercial process by replacing benzoyl peroxide with lauroyl peroxide. The purpose of this replacement, according to Armstrong, was to have a non-infringing process in the event this Court's holding of infringement eventually resulted in a judgment enjoining Armstrong's use of the benzoyl peroxide process and in order to stop the accrual of potential damages for Armstrong's past use of that process.[3]

On January 4, 1973, Armstrong instituted this action for a declaratory judgment that their chemically-embossed foamed vinyl floor covering process and products using lauroyl peroxide do not infringe the '094 and '108 patents.

Congoleum moved to dismiss the action or in the alternative to stay the action until all issues in the benzoyl peroxide litigation were determined. By Order dated June 1, 1973, we denied the motion and directed Congoleum to answer Armstrong's complaint. Congoleum answered the complaint and counter-claimed that the Armstrong process and products using lauroyl peroxide infringe the '094 and '108 patents.

Discovery was held and the thirty-eight day trial began on January 28, 1974. Counsel for each side have submitted proposed Findings of Fact, and Conclusions of Law. Final oral argument has been held, and each side has responded to certain hypothetical questions propounded by the Court. Thus, after careful examination and consideration of the exhibits and records admitted at trial, the Court makes the following:

## FINDINGS OF FACT

1. Plaintiff, Armstrong Cork Company, (hereinafter "Armstrong"), is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania.

2. Defendant, Congoleum Industries, Inc., (hereinafter "Congoleum"), is a corporation organized and existing under the laws of the State of Delaware. Congoleum is the owner by assignment of all right, title and interest in and to the patents in suit.

3. This is a declaratory judgment action brought by Armstrong relating to United States Letters Patent 3,293,094 and 3,293,108 (referred to as the '094 patent and the '108 patent, respectively). The '094 patent is entitled "TEXTURED FOAM PROCESSES" and the '108 patent is entitled "TEXTURED FOAM PRODUCTS." Both patents were granted on December 20, 1966, and were issued to Congoleum-Nairn, Inc., predecessor of Congoleum Industries, Inc., as an assignee of the applicants, R. Frank Nairn, Joseph C. Harkins, Jr., Frank E. Ehrenfeld, Jr., and Hilton Tarlow.

4. Armstrong seeks a declaration that its manufacture, use and sale of textured foam products made by the use

---

3. By letter dated March 26, 1973, to the Court from Edward W. Mullinix, Esquire, attorney for Armstrong Cork Company.

of monomer/peroxide process in which lauroyl peroxide is the peroxide used does not infringe any claim of either of the two patents in suit. Congoleum has denied that Armstrong is entitled to a declaration of non-infringement and has filed a counter-claim in this action charging Armstrong with infringement of the '094 and '108 patents.

5. The two patents in suit have been involved in prior litigation between the parties in this Court. *Congoleum Industries, Inc. v. Armstrong Cork Company,* Civil Action 41,762, 339 F.Supp. 1036 (E.D.Pa.1972). On February 23, 1972, this Court found the two patents in suit to be valid and infringed by Armstrong's use of a monomer/peroxide process using benzoyl peroxide as the peroxide. The validity of the two patents in suit is not here challenged or in suit.

6. Commencing March, 1972, Armstrong began plant tests of lauroyl peroxide as a replacement for benzoyl peroxide in the printing ink of its embossing process. In January, 1973, Armstrong fully replaced benzoyl peroxide in the embossing ink by lauroyl peroxide in all of its commercial production of chemically embossed products and commenced the present declaratory judgment action on January 4, 1973.

7. The two patents in suit describe the application of chemical embossing, as defined in the patents, to foam vinyl products of the prior art. These prior art foam vinyl products, exemplified by unembossed Cushionflor, manufactured in 1963 by Congoleum are disclosed in the patents as being manufactured by a process including the steps of:

(a) Applying a layer of foamable resinous plastisol to a suitable base, the foamable resinous plastisol containing sufficient blowing agent that it will expand to the desired foam thickness upon heating to the selected processing temperature;

(b) the foamable resinous plastisol is gelled by mild heating to form a printable surface without decomposing the blowing agent;

(c) inks to form a decorative design are applied to the surface of the gelled foamable plastisol, typically employing multistage rotogravure printing equipment;

(d) in order to impart wearing qualities to the finished products, the printed gel is covered with a second non-foamable vinyl material called a "wear-layer";

(e) the entire product with its several layers is heated to a processing temperature sufficient to fuse the vinyl resins and to cause the blowing agent in the foamable composition to decompose, releasing gas as small bubbles throughout the foamable interlayer. Plasticized polyvinyl chloride resins were normally used. Azodicarbonamide was the preferred blowing agent, since the stabilizers normally used for polyvinyl chloride formulations promoted the decomposition of azodicarbonamide, and therefore it decomposed as the normal processing temperature for such formulations.

8. The two patents in suit further disclose that minor amounts of metal salts are usually incorporated as stabilizers in the foamable composition to reduce degradation by heat and light. Vinyl chloride systems are not normally used without such a metal salt stabilizer. Such stabilizers can also exert an influence on the decomposition temperature of the blowing agent.

9. The two patents in suit further disclose that to emboss chemically such foam vinyl products an inhibitor is applied before the foaming step.

10. An inhibitor, as that term is used in the patents in suit, is an agent which alters the temperature at which the blowing agent decomposes or the combination of a blowing agent with an accelerator, in the area of a foamable resinous polymer composition above or below where it is deposited.

11. In the final heating step of the chemical embossing process of the patents in suit the uniform heating is controlled as to time and temperature so that more blowing agent is decomposed in a raised area than in an adjacent depressed area to produce an embossed product. The greater decomposition of the blowing agent causes the raised or uninhibited area to expand more than the depressed area during the final heating step because of the greater amount of gas liberated.

12. The chemical embossing results from the modification of the chemical reactions involved in the decomposition of the blowing agent by the interreaction between an inhibitor, printed on the surface of a foamable composition, and the blowing system employed in the said composition so that the blowing agent decomposes to a greater or lesser extent in those areas where the inhibitor is present than in areas in which the inhibitor is not present.

13. The effect which the inhibitor has on the blowing system as described in the patents in suit is there stated as substantially altering the temperature at which the blowing agent decomposes.

14. The finished chemically embossed floor covering products described in the patents in suit are made by the above process and have the preferred construction of a felt base, a foam interlayer, a printed design, and a transparent vinyl surface layer.

15. Where an inhibitor has been applied which results in depressed areas, the cells of the foam layer below the depressed portion can be smaller than the cells of the foam layer in the other portions because of the reduced gas evolution caused by the inhibitor.

16. Because the depressed areas occur where the inhibitor has been printed, there can be perfect registration between the embossing and any pattern printed at the same time as the inhibitor is applied during the printing operation.

17. The patents in suit disclose that the type of compound used as an inhibitor may vary widely.

18. A simple test set forth in the patents to determine whether, under specific conditions of use, a given compound is capable of substantially altering the temperature at which the blowing agent decomposes and thus functions as an inhibitor.

19. By utilizing the simple test set forth in the patents in suit, any person skilled in the art can determine a given compound's usefulness as an inhibitor under the specific conditions of use.

20. The first step in Armstrong's monomer/peroxide process for chemically embossed foam products is to apply a layer of foamable vinyl chloride plastisol to a felt base. A blowing agent (azodicarbonamide) is uniformly distributed throughout the polyvinyl chloride resin. Additionally, the foamable plastisol contains a uniformly distributed stabilizer-accelerator (usually zinc octoate) and a uniformly distributed polymerizable monomer (usually trimethylol propane trimethacrylate).

21. The foamable plastisol is then sufficiently heated to gel, or at least partially fuse it, but not sufficiently to decompose the azodicarbonamide. The gelled layer is self-supporting.

22. A design pattern is then printed on the surface of the foamable gelled composition by a rotogravure machine.

23. In those areas of the design where embossing is desired, the ink contains lauroyl peroxide. The remaining printed areas of the design are printed with ink which does not contain lauroyl peroxide.

24. Lauroyl peroxide is the chemical ingredient used by Armstrong in its ink to cause embossing where applied in its commercial resilient vinyl floor products.

25. A transparent nonfoamable thermoplastic vinyl resinous composition which does not contain a blowing agent is applied to cover this printed gelled foamable composition as a wear layer.

26. The entire laminate is then heated in commercial ovens to completely fuse the resinous composition and decompose sufficient blowing agent to form a foam vinyl product having the desired foam thickness. The finished product is cooled. These fusion and foaming ovens apply heat as uniformly as possible to the surface of the goods being processed. The final heating step of Armstrong's process is controlled as to time and temperature.

27. During the defendant's commercial process, the monomer in the depressed areas of the product becomes a cross-linked polymer, as indicated by its insolubility in the solvent tetrahydrofuran.

28. Lauroyl peroxide penetrates into the foamable layer where it is applied.

29. Lauroyl peroxide is at least partly soluble in at least one component of the foamable composition during the fusion process.

30. Armstrong's finished commercial products are cellular foam vinyl floor coverings having depressed areas. The products have a felt base, a foam interlayer, a printed design and a clear vinyl wear layer.

31. The depressed areas in the finished product correspond to the areas where the lauroyl peroxide was applied.

32. The average size of the foam cells in the depressed area of Armstrong's commercial product is substantially smaller than the average size of the foam cells in the raised area.

33. The printed design of Armstrong's commercial product is in register with the depressed areas.

34. The foam interlayer of Armstrong's commercial products contains undecomposed azodicarbonamide and thermal decomposition products thereof.

35. Azodicarbonamide in the Armstrong commercial product is uniformly distributed throughout the gelled sheet prior to printing and blowing.

36. After printing and blowing there is a significantly greater amount of un-decomposed (residual) blowing agent found in the depressed (mortar) areas than in the raised (land) areas of Armstrong's commercial foamed products.

37. There is a direct relationship between the amount of foam formed in the raised and depressed areas of Armstrong's commercial products and the amount of blowing agent (azodicarbonamide) decomposed in the raised and depressed areas of Armstrong's commercial products as determined by the amount of residual undecomposed blowing agent found in the raised and depressed areas.

38. The residual azodicarbonamide differences are related to an alteration in the temperature at which the blowing agent decomposed because of three factors which affect the amount of blowing agents which decomposes in the foamable composition. These factors are:

(i) the temperature of the goods being processed;

(ii) the length of time of heating; and

(iii) the decomposition temperature of the blowing agent.

39. The decomposition temperature is that range of temperature over which the blowing agent will provide a suitable amount of gas to form the desired amount of foam. The simplest practical measure of this decomposition temperature is that temperature at which the gel must be heated to achieve the desired amount of foam from the blowing agent decomposed.

40. Where the time in the oven for adjacent raised and depressed areas was equal and the heat was applied as uniformly as possible, the difference found in the amount of residual blowing agent between adjacent raised and depressed areas indicates that the temperature at which the blowing agent decomposed was different, resulting in a difference in the amount of blowing agent decomposed in those respective areas.

41. The only difference in the composition of the gelled sheet being heated

to produce the embossed foam product was that the areas embossed had been printed with an ink containing lauroyl peroxide.

42. The difference in the amount of residual or undecomposed blowing agent remaining in the mortar and land areas and the related difference in the amount of foam formed in the mortar and land areas is a result of the application of lauroyl peroxide in the embossing ink.

43. The lauroyl peroxide acted to alter or raise the temperature at which the azodicarbonamide blowing agent decomposed in the areas where applied with the printing ink.

44. The difference in the amount of azodicarbonamide decomposed in raised and depressed areas of Armstrong foamed product first resulted in the blowing oven and was not the result of heating or cooling effect subsequent to the oven exit. This was determined by quenching in liquid nitrogen the oven product immediately upon exit from the oven. The quenching prevented any additional decomposition of the blowing agent.

45. In the usual Armstrong commercial operation, some additional decomposition of the blowing agent in both raised and depressed areas may take place subsequent to exit from the oven until the product cools to approximately 355° F. when decomposition stops. The difference found in the total amount of blowing agent decomposed at oven exit follow the same proportion as predicted by Dr. Ezrin's tests. This additionally confirms the fact that the temperature at which the blowing agent decomposes is altered in the depressed (mortar) areas by the application of the embossing ink containing lauroyl peroxide.

46. The increase in the temperature at which the blowing agent (azodicarbonamide) decomposes in the depressed areas (mortar) areas where the lauroyl peroxide was applied with the printing ink was found in some products to be at least 2–3° F. Armstrong's more deeply embossed products showed an even greater difference in the relative amounts of blowing agent decomposed in mortar and land areas and a corresponding greater increase in the temperature at which the blowing agent decomposes in the depressed areas.

47. Embossing can vary in depth from very weak to very strong, but each product is nevertheless embossed if the embossing is visible. That some degree of embossing is used in commercial production is ample evidence that its use does enhance saleability of the product; otherwise the embossing process obviously would not have been used.

48. Armstrong's foamed products made by the monomer/peroxide process using lauroyl peroxide in the printing ink are embossed in areas printed with that ink. Typically the depth of embossing is from 3 up to 10.4 mils. It is a significant amount of embossing and comparable to competitive products on the market.

49. The embossing achieved by the Armstrong process is not illusionary, but is visible and measurable.

50. The alteration of the decomposition temperature of the blowing agent in Armstrong's commercial process is sufficient to cause an embossed effect which will enhance the saleability of the defendant's commercial product.

## DISCUSSION

The sole issue for our determination is whether Armstrong's chemically embossed foamed vinyl floor covering process and products using lauroyl peroxide infringe the '094 and '108 patents owned by Congoleum.[4] Specifically, we must determine the factual issue of whether the embossing in the Armstrong commercial product is achieved by use of an

---

4. Issues of validity, obviousness, and sufficiency of disclosure were determined in the prior litigation between the parties and are not before the Court in this action. *Congo-* *leum v. Armstrong*, 339 F.Supp. 1036 (E.D. Pa.1972), affirmed, 510 F.2d 334 (3rd Cir. 1975).

inhibitor which substantially alters the decomposition temperature of the blowing agent. Once again, although the patents each contain several independent claims and numerous dependent claims, it is this one concept which is our prime concern.

The burden of proving infringement rests on the party asserting it,[5] in this case Congoleum. For the reasons which follow we conclude that Congoleum has sustained its burden of proof.

### Patents In Suit

The patents in suit disclose a process for the manufacture of a chemically embossed cellular foam vinyl floor covering. A typical example of which is the simulated brick or tile patterns found in many kitchens and bathrooms today wherein the brick or tile areas are raised and the mortar areas are depressed creating an embossed effect.[6]

The patented process calls for the application of a foamable resinous plastisol to a suitable base, usually felt. The plastisol contains a uniformly distributed blowing agent and an accelerator for that blowing agent. The plastisol is gelled by mild heating to form a surface capable of being printed upon. Selected inks to form a decorative design are then printed on the surface of the gelled plastisol, typically employing multistage rotogravure printing equipment. To impart long wearing qualities to the finished product, the printed gel is next covered with a non-foamable vinyl material called a "wear-layer." The entire laminate is reheated to a temperature sufficient to fuse the vinyl resins and to cause the blowing agent to decompose.

The preferred blowing agent is azodicarbonamide which when it reaches a certain temperature will decompose, that is, it liberates gas. The common expression in the industry for this phenomenon is called "blowing." When the azodicarbonamide decomposes or blows it liberates nitrogen gas. The nitrogen gas is trapped as small bubbles throughout the plastisol which causes an increase in foam height and also gives to the product a spongy and resilient composition.

The patents in suit further disclose that to emboss chemically these foamed vinyl products an inhibitor is applied before the final heat stage during which the azodicarbonamide blows. An inhibitor, as that term is used in the patents in suit, is an agent which alters the temperature at which the azodicarbonamide decomposes in the area where it is deposited.[7]

5. *Gammeyer v. Newton*, 94 U.S. 225, 24 L. Ed. 72 (1877); *Fried Krupp Aktien-Gesell-schaft v. Midvale Steel Co.*, 191 F. 588 (3rd Cir. 1911), *cert.* den., 223 U.S. 728, 32 S.Ct. 526, 56 L.Ed. 633 (1911); *American Cy-anamid Co. v. Hercules, Inc.*, 260 F.Supp. 368 (D.Del.1966).

6. See, *Congoleum v. Armstrong*, 510 F.2d 334, 335, fn. 2.

7. To illustrate this phenomenon, suppose that azodicarbonamide decomposes at 400° Fahrenheit (hereinafter F.), if the laminate is heated to 400° F. the azodicarbonamide will blow uniformly and the foamable plastisol will rise in foam thickness uniformly. If an inhibitor chemical, which has the effect of raising the decomposition temperature of the azodicarbonamide to 410° F., is added to the plastisol and the laminate is heated to 400° F. the azodicarbonamide will not blow, the plastisol will not foam, and the product will remain flat.

A very simple illustration of alteration of decomposition temperature would be that if you have water and you know its boiling point, if you add so much salt to the water, the salt will alter the boiling point; that is, it will alter the temperature at which the water will boil and liberate steam.

To return to our illustration, if an inhibitor is selectively deposited and the laminate again heated to 400° F., where the inhibitor was deposited the azodicarbonamide will not blow and the plastisol will remain flat, conversely where the inhibitor was not deposited the azodicarbonamide will blow and the product will rise in foam thickness. Thinking back to our simulated brick pattern the importance of the patent begins to focus in significance. If a brick pattern is printed on a gelled composition and the brick-red ink contains no inhibitor while the mortar-white ink contains an inhibitor, when the laminate is heated to the predetermined temperature the simulated bricks will be raised because

The chemically embossed vinyl floor covering product described in the patents in suit has a felt base, a foam interlayer, a printed design in register with the embossed surface, and a transparent non-foamable vinyl wear layer.

### Armstrong Process

Similarly, the Armstrong monomer/peroxide process produces a chemically embossed vinyl floor covering product which has a felt base, a foam interlayer, a printed design in register with an embossed surface, and a transparent non-foamable vinyl wear layer.

Like the process described in the patents in suit the layer of foamable vinyl plastisol contains a uniformly distributed blowing agent, azodicarbonamide, and an accelerator for that blowing agent, usually zinc octoate.

Unlike the patented process, Armstrong's plastisol also contains a polymerizable monomer, usually trimethylol propane trimethacrylate.

The Armstrong manufacturing process begins with the application of the foamable plastisol to a felt base. These are heated to form a gel capable of being printed upon. Selected inks to form a decorative design are then printed on the surface of the gelled plastisol by a rotogravure printing machine. In those areas where embossing is desired selected inks contain a polymerization catalyst, namely, lauroyl peroxide. The printed gel composition is then coated with a clear non-foamable wear-layer. The entire laminate is reheated sufficiently to fuse the resin and decompose the blowing agent.

Embossing is achieved, according to Armstrong, by the physical restriction of the foam growth in those areas printed with lauroyl peroxide.

In those areas of an Armstrong design where embossing is desired, the ink contains lauroyl peroxide. The embossed areas are called "mortar" areas and the remaining areas are called "land" areas. Where no embossing is desired (i. e., the land areas) the ink applied contains no lauroyl peroxide. During the reheating step, but before the azodicarbonamide decomposes, the lauroyl peroxide initiates a catalytic polymerization of the monomer and cross-linking of the mortar materials which causes a change in the viscoelastic or rheological properties of the plastisol in the mortar areas: in common parlance, this means the mortar area becomes stiffer than the land area. When the azodicarbonamide does reach its decomposition temperature the ability of the plastisol to expand in the mortar areas is physically restricted. In the remaining land areas, the plastisol is free to expand as the azodicarbonamide decomposes.

Thus, Armstrong contends that since chemical embossing in its product is the result of physically restricting the foam in selected areas of the printed design and not by an alteration in the decomposition temperature of the blowing agent, the process and product do not infringe the patents in suit.

Conversely, Congoleum contends that embossing results in the Armstrong product because according to its tests lauroyl peroxide does in fact alter the decomposition temperature of the blowing agent.

### Infringement

Inquiry begins with the threshold issue of residual azodicarbonamide. By virtue of the alteration of decomposition temperature of the azodicarbonamide, a characteristic of the finished product of the patents in suit is a difference in re-

in the absence of the inhibitor the azodicarbonamide will blow, the nitrogen gas bubbles will be trapped in the plastisol, and the foam will increase in thickness, meanwhile the simulated mortars will be depressed in comparison because the decomposition tem-

perature of the azodicarbonamide in the mortars has been elevated above the oven temperature preventing the azodicarbonamide from blowing.
This is an illustration only, it in no wise represents the actual process involved.

sidual azodicarbonamide as between the mortars and the lands, resulting in more residual azodicarbonamide in the mortars than in the lands. This fact would seem to follow from the patented process. For if the decomposition temperature of the azodicarbonamide is altered (i. e., raised) in the mortars so that the rate of decomposition of the azodicarbonamide is less there than the unaltered rate of decomposition of the azodicarbonamide in the lands then, of course, there will be greater residual azodicarbonamide in the mortars than in the lands in the finished product. Of significance is the fact that the Armstrong finished product likewise exhibits a residual azodicarbonamide difference as between lands and mortars. The crucial question is whether this residual azodicarbonamide difference in the Armstrong product is a manifestation of alteration of the decomposition temperature of the blowing agent. Congoleum contends that it is; Armstrong contends that factors other than alteration of decomposition temperature of the azodicarbonamide cause the residual azodicarbonamide difference in its finished product.

Once again, Congoleum noted that there are three factors which affect the amount of blowing agent which decomposes in the foamable composition. These factors are: (1) the temperature of the goods being processed; (2) the length of time of heating; (3) the decomposition temperature of the blowing agent. Thus, the following syllogism: Where the time in the oven for both raised and depressed areas (land and mortars) is equal, and the heat is applied as uniformly as possible to the entire gelled sheet, a difference in residual blowing agent between raised and depressed areas indicates that the decomposition temperature of the blowing agent was different in those respective areas.

At trial, Congoleum also presented evidence which has come to be known as the Ezrin Proportionality Theory. According to this theory there is a direct relationship in the Armstrong commercial product between the amount of foam formed in the raised and depressed areas and the amount of blowing agent (azodicarbonamide) decomposed in those areas.

These data when conjoined with proof of equal temperature of the goods being processed and equal length of time of the heating of the goods evidences alteration of decomposition temperature of the blowing agent as the reason for the residual azodicarbonamide differential.

Armstrong attacks the syllogism by challenging the assumption that the heating of the depressed and raised areas is uniform throughout the process. It is Armstrong's contention that while restriction accounts for its embossing, different heat histories account for the difference in residual azodicarbonamide. To elaborate, Armstrong contends that three distinct phenomena contribute to a difference in time-temperature histories between adjacent land and mortar areas of the Armstrong commercial product, causing a difference in residual azodicarbonamide. These phenomena are: (1) rheological temperature difference effect; (2) monomer exotherm temperature difference effect; (3) ink mass temperature difference effect.

The Court has no trouble in dismissing the latter two phenomena from serious consideration since there is no reliable evidence, in the Court's opinion, that monomer exotherm temperature difference effect and ink mass temperature difference effect, either alone or in combination, could possibly account for a temperature difference substantial enough to cause the resultant difference in residual azodicarbonamide as it exists in the Armstrong commercial product.

Armstrong's third phenomenon, the rheological temperature difference effect, or what has been called the differential cooling effect theory presents a different explanation for the residual azodicarbonamide difference. According to this theory because of cross-linking at

an earlier stage in the Armstrong process, the mortar foam does not "grow" as high as the land foam upon azodicarbonamide decomposition before exit from the heating zone. After exit, interior layers of the higher land foam are between insulators from the cooling air; hence they stay hot longer and blow faster and longer—consequently consuming more azodicarbonamide than the flatter less insulated mortar areas which causes the residual azodicarbonamide difference.

Congoleum countered this theory with the liquid nitrogen quench experiment. Since Armstrong does not suggest any phenomenon such as deinhibition,[8] any inhibition that is to take place must take place in the oven. Therefore, if a sample of Armstrong product could be taken from the oven at the moment of exit and instantly have its processes totally arrested—thus eliminating cooling period and the time during which the cooling effect theory comes into operation—and that sample examined to determine its foam height and residual azodicarbonamide, the credibility of the cooling effect theory could be ultimately evaluated. Consequently, Congoleum devised an experiment which provided for the immediate submersion of an Armstrong sample into liquid nitrogen upon oven exit. The results of this experiment were dramatic. First, there was found to be residual azodicarbonamide difference as between the land and mortar areas which fact would show that this difference must have evolved in the oven. Second, the sample was subjected to the Ezrin Proportionality Theory and the foam height and decomposed azodicarbonamide were found to be proportional.

We have reviewed all of the factual evidence offered by both sides and we conclude that lauroyl peroxide alters the decomposition temperature of the blowing agent in the Armstrong commercial process.

Based on the credible evidence offered at trial we further conclude that there is a difference in decomposition temperature of at least 2°–3° Fahrenheit between those areas of the Armstrong commercial product which are printed with lauroyl peroxide and those areas not so printed.

Finally, based on convincing proofs at trial we conclude that it this alteration of decomposition temperature of a 2°–3° Fahrenheit magnitude which accounts for virtually all of the embossing in the Armstrong commercial product.

Thus, we must find that lauroyl peroxide, as used in the Armstrong commercial process, is an inhibitor which substantially alters the decomposition temperature at which at least some of the blowing agent decomposes.

We conclude that Armstrong has infringed the independent claims numbered 1, 28, 55, and 62 of United States Letters Patent 3,293,094 and 1 and 25 of United States Letters Patent 3,293.108. Furthermore, we conclude that Armstrong has infringed the dependent claims numbered 2, 3, 5, 6, 7, 8, 9, 16, 21, 22, 26, 27, 29, 30 and 32 of the '094 patent and 2, 3, 4, 5, 6, 11, 15, 16, 17, 18, 20, 21, 26, 28, 30, 33, 34, 39, of the '108 patent.

Congoleum's right to an accounting and an injunction will be deferred pending appropriate future proceedings.

*Damages*

No evidence has been presented with respect to damages due to the bifurcated trial format. Pending a determination of that phase of the case, we will also hold in abeyance any determination as to damages allowable under 35 U.S.C. § 284, and attorneys' fees, awardable in exceptional cases under 35 U.S.C. § 285.

CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this action and the parties to this action. 28 U.S.C. § 1338.

---

**8.** Transcript of final oral argument, March 12, 1975, at page 57.

2. The issue of validity of the patents in suit, having been determined in the prior litigation between the parties, Civil Action No. 41,762, is not before the Court in this action. *Congoleum Industries, Inc. v. Armstrong Cork Company*, 510 F.2d 334 (3rd Cir. 1975); *Plymouth Rubber Company, Inc. v. Minnesota Mining and Manufacturing Company*, 321 F.2d 151, 156–157 (1 Cir. 1963); 1B, *J. Moore, Federal Practice*, ¶ 0.441.

3. The scope of the patents in suit, having been determined in the prior litigation between the parties, Civil Action No. 41,762, is not before the court in this action. *Congoleum Industries, Inc. v. Armstrong Cork Company*, 510 F.2d 334 (3rd Cir. 1975); *Plymouth Rubber Company, Inc. v. Minnesota Mining and Manufacturing Company*, 321 F.2d 151, 156–157 (1st Cir. 1963); *Vanderveer v. Erie Malleable Iron Company*, 328 F.2d 510, 514–515 (3rd Cir. 1956); 1B, *J. Moore, Federal Practice*, ¶ 0.441.

4. Sufficiency of the disclosure of the patents in suit and particularity of the claims therein under 35 U.S.C. § 112, having been determined in the prior litigation between the parties, Civil Action No. 41,762, is not before the court in this action. *Congoleum Industries, Inc. v. Armstrong Cork Company*, 510 F.2d 334 (3rd Cir. 1975); *Plymouth Rubber Company, Inc. v. Minnesota Mining and Manufacturing Company*, 321 F.2d 151, 156–157 (1st Cir. 1963); *Vanderveer v. Erie Malleable Iron Company*, 238 F.2d 510, 514–515, (3rd Cir. 1956); 1B, *J. Moore, Federal Practice*, ¶ 0.441[2].

■ (a) There is no requirement that all compositions that may work as inhibitors be specifically disclosed in the patents in suit. *Georgia-Pacific Corporation v. United States Plywood Corp.*, 258 F.2d 124 (2nd Cir. 1958); *S. D. Warren Co. v. Nashua Gummed and Coated Paper Co.*, 205 F.2d 602 (1st Cir. 1953).

■ (b) There is no requirement that the patentee know the specific chemical explanations for how his invention works. *Marvel Speciality Company v. Bell Hosiery Mills, Inc.*, 330 F.2d 164, 173 (4th Cir. 1964); *Intermountain Research & Engineering Co. v. Hercules Incorporated*, 406 F.2d 133 (9th Cir. 1969).

5. Plaintiff's monomer/peroxide process involving the use of lauroyl peroxide infringes Claims 1, 2, 3, 5, 6, 7, 8, 9, 16, 21, 22, 26, 27, 28, 29, 30, 32, 55 and 62 of United States Patent No. 3,293,094.

■ (a) When the claims in suit read literally on the accused activity, there is no need to resort to the doctrine of equivalence or to file wrapper estoppel. *Paper Converting Machine Co. v. FMC Corporation*, 409 F.2d 344 (7th Cir. 1969); *Williams Bit & Tool Company v. Christensen Diamond Products Co.*, 399 F.2d 628 (5th Cir. 1968).

■ (b) In determining the meaning to be given to words used in the patents in suit, the entire disclosure as well as the sense of the disclosure and the purposes of the patentee are to be given full effect. The patentee can be his own lexicographer. *Canaan Products, Inc. v. Edward Don & Co.*, 388 F.2d 540 (7th Cir. 1968).

■ (c) Infringement is not avoided by the addition of other steps or embellishments to the patented process or by an imperfect practice of the patented invention such as plaintiff's weak rather than strong embossing. *Graver Tank and Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

6. Plaintiff's products made by use of its monomer/peroxide process involving the use of lauroyl peroxide infringe Claims 1, 2, 3, 4, 5, 6, 11, 15, 16, 17, 18, 20, 21, 25, 26, 28, 30, 33, 34, and 39 of the United States Patent No. 3,293,108.