MANNINGTON MILLS, INC., Appellant,

v.

CONGOLEUM INDUSTRIES, INC., Appellee.

No. 78–2431.

United States Court of Appeals, Third Circuit.

Argued June 5, 1979.

Decided Aug. 1, 1979.

---

Frederick W. Rose, Newark, N. J., Michael M. Maney, Michael Winger (argued), Robert M. Hayes, New York City, Richard T. Laughlin, Kearny, N. J., for appellee; Young, Rose & Millspaugh, Newark, N. J., Sullivan & Cromwell, New York City, of counsel.

John N. Bain, Carella, Bain, Gilfillan & Rhodes, Newark, N. J., Norman Polovoy

(argued), Joseph M. Fairbanks, Weinberg & Green, Baltimore, Md., for appellant.

Before ALDISERT, GIBBONS and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Plaintiff Mannington Mills, Inc. (Mannington) appeals from a final judgment (1) dismissing, after a full trial to the court, its contractual and equitable claims to sales licenses under certain foreign patents held by defendant Congoleum Corporation (Congoleum), and (2) granting summary judgment on seven counts of its amended complaint sounding in antitrust. Only two counts of the antitrust claim are pressed on this appeal. We affirm the district court's dismissal of Mannington's license claims, and the grant of summary judgment on its claim that Congoleum arbitrarily and discriminatorily denied it access to unpatented know how in violation of § 2 of the Sherman Act. We think, however, that Mannington's allegation that Congoleum conspired with certain of its foreign licensees to terminate Mannington's foreign sales licenses states a claim on which relief may be granted under § 1 of the Sherman Act. Because Mannington has not yet had an adequate opportunity to conduct discovery on the factual issues relevant to that allegation, we reverse the grant of summary judgment on the conspiracy claim.[1]

## I. FACTS

The facts are stated here as found by the district court.[2] Mannington is a New Jersey corporation which has for a number of years manufactured chemically embossed vinyl floor covering at a plant in Salem, New Jersey. Congoleum also manufactures chemically embossed vinyl tile. Prior to 1966, chemically embossed vinyl tile was manufactured and sold in the United States and foreign countries by Congoleum, Mannington, and other companies, including the Ruberoid Corporation (now GAF Corporation) and the Armstrong Cork Co. In that year two United States patents covering the manufacture and use of embossed vinyl products were issued to Congoleum, which immediately commenced infringement actions against Mannington, Armstrong and Ruberoid. Congoleum now holds similar patents in 26 foreign countries.

Some months after the filing of its infringement action Congoleum sent to Mannington a draft License Agreement and Litigation Settlement. Serious settlement negotiations began in the spring of 1968. In order to protect its competitive position as against any firms subsequently licensed under the Congoleum patents, Mannington sought from the outset to include in the proposed license agreement a most favored licensee clause. Congoleum's proposed second draft of the domestic License Agreement contained such a clause, which Mannington redrafted in the form which appeared in the executed agreement. The parties simultaneously negotiated a separate Letter Agreement concerning the terms of additional licenses from Congoleum to Mannington to sell the patented product in foreign countries. A preliminary draft of that agreement was submitted to Mannington in April, 1968, and in May, Congoleum informed Mannington of those countries in which it would be licensed to sell.

On May 21 and 22, 1968, Congoleum and Mannington respectively executed three agreements in settlement of the pending litigation: the License Agreement and Litigation Settlement (License Agreement), a Letter Agreement (Letter Agreement) regarding Mannington's license rights in for-

1. Prior appeals in other related cases growing out of the same dispute between Mannington and Congoleum were before this court in *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287 (3d Cir. 1979), and *Mannington Mills, Inc. v. Congoleum Industries, Inc.*, 577 F.2d 727 (1978) (mem.).

2. The opinion of the district court on the license claims is reported at 197 U.S.Pat.Q. 145 (D.N.J.1977).

eign countries, and an Agreement not to Appeal a certain decision of the New Jersey Superior Court. The last document is not at issue here.

The grant clause of the License Agreement[3] gives the licensee under the patent rights the right to make, use, and sell the licensed products in the United States, its territories and possessions. The term "Patent Rights" is defined in Paragraph 1(a) of the Agreement as "rights under (i) the Letters Patent set forth in SCHEDULE 'A', (ii) all extensions and reissues thereof." Schedule A lists only the two United States patents. The Agreement defines "Licensed Products" as any floor covering covered under the "Patent Rights." The License Agreement provides for a royalty of six and one-half percent of the net sales price of all Licensed Products made and used or made and sold under the Agreement, and is terminable only for cause or at the end of the life of the patents. Paragraph 16 of the Agreement contains the most favored licensee clause sought and drafted by Mannington.[4] Finally, the License Agreement specifies that it is to be construed and interpreted under New York law.

The Letter Agreement provides in relevant part that Mannington is licensed to sell United States manufactured "Licensed Products" as defined in the License Agreement in twenty listed foreign countries.[5]

The foreign sales licenses are subject to revocation by either Congoleum or Mannington "at any time upon giving the other party at least six months' written notice." The Letter Agreement contains no provision comparable to the most favored licensee clause of the License Agreement.

In 1970, Congoleum and the GAF Corporation settled their pending infringement suit. Congoleum granted GAF make, use, and sell licenses, under the United States patents for the United States and its territories and possessions, and under its foreign patents for 26 foreign countries. The settlement was embodied in two documents: a License Agreement and Litigation Settlement (the GAF License) and a Manufacturing Agreement. The terms of the GAF domestic and foreign licenses were more favorable than those of the Mannington licenses in several respects. The GAF royalty rate was five percent, one and one-half percent lower than Mannington's. GAF was given the right to sell in six additional foreign countries in which Mannington was not licensed: Canada, Australia, New Zealand, Japan, Ireland, and Holland. Moreover, unlike the foreign licenses granted to Mannington, GAF's foreign licenses were terminable only for cause. Two other provisions of the GAF license are relevant to this action: paragraph 4,[6] the grant clause,

---

3. The grant clause reads as follows:
 LICENSOR hereby grants to LICENSEE under the PATENT RIGHTS, subject to the terms, conditions and limitations hereof, a non-exclusive right and license to
 (i) make and use, and
 (ii) make and sell
 said LICENSED PRODUCTS in the United States, its territories and possessions.

4. LICENSOR agrees that should it hereafter grant a license to a third party under the PATENT RIGHTS to make and use or sell the LICENSED PRODUCTS on more favorable terms or conditions than those extended to LICENSEE under this agreement, then LICENSEE shall be entitled to such more favorable terms and conditions as of the time they are or become effective as to such third party and for so long as they shall continue to be so effective.

5. Argentina, Austria, Belgium, Brazil, Chile, Colombia, France, West Germany, Greece, In-

dia, Israel, Mexico, Pakistan, Peru, Philippines, Spain, Sweden, Switzerland, Turkey, and Venezuela.

6. 4. (a) LICENSOR hereby grants to LICENSEE under the PATENT RIGHTS, subject to the terms, conditions and limitations hereof, a non-exclusive right and license to make, use or sell LICENSED PRODUCTS throughout the United States of America, its territories and possessions.
 (b) LICENSOR hereby grants to LICENSEE a non-exclusive license to sell, under all Foreign PATENT RIGHTS, LICENSED PRODUCT(S) manufactured by LICENSEE under paragraph 4(a) hereof.
 (c) The rights and licenses granted under paragraphs 4(a) and (b) shall run with all subsequent resales of LICENSED PRODUCTS as such or as components of another assemblage, e. g., mobile homes.

and paragraph 13(b),[7] a covenant not to sue the licensee or its customers. The Manufacturing Agreement gives GAF the right to manufacture the patented product in all the foreign countries of licensed sale after January 1, 1974.

On May 27, 1970, in compliance with the most favored licensee clause of the License Agreement, Congoleum's President, Harry F. Pearson, sent a letter to Mannington offering the more favorable terms of the GAF License relating to United States patents. Pearson offered, *inter alia*, the five percent royalty rate, and paragraphs 4(a) and 4(c) of the GAF License. No mention was made of paragraphs 4(b) or 13(b) of the GAF agreement, of patent rights in the six foreign countries where Mannington had not been granted rights, or of the terms of the foreign Manufacturing Agreement. On July 1, 1970, Congoleum sent Mannington's counsel a copy of the GAF License. Mannington's representatives were not sent a copy of the Manufacturing Agreement and did not learn of its existence until a week before trial.

On July 15, 1970, Mannington and Congoleum met to discuss the more favorable terms of the GAF License. Mannington was represented by its President, H. Arthur Williams, its patent counsel, Thomas Cifelli, and its general counsel, George Doub. Congoleum was represented by its President, Pearson, its patent counsel, Richard T. Laughlin, and its general counsel, Ralph M. Jerskey. Mannington wished to obtain expanded foreign license rights, particularly in Canada. Without such rights, Mannington feared that it would be unable to compete effectively with GAF and Armstrong, both of which were selling in Canada. At the meeting, Mannington expressed its desire for Canadian license rights and took the position that under ¶ 16 of the License Agreement it was entitled to the more favorable foreign license rights granted to GAF. Congoleum rejected that argument on the ground that the most favored licensee clause applied only to license rights under the United States patents.

The sense of the July 15 meeting was expressed in a letter agreement of July 17, 1970 (hereinafter License Agreement Amendment). The License Agreement Amendment modified the License Agreement by incorporating, with two exceptions not here relevant, the terms which Congoleum had offered by its letter of May 27, 1970. Because Mannington and Congoleum could not agree as to the effect of the most favored licensee clause on foreign license rights, the License Agreement Amendment expressly stated that the parties' concurrence in the modification of the license as provided therein was not to be construed as a relinquishment by either party of its position on that clause. In a cover letter to the signed copies of the License Agreement Amendment, Williams stated his hope that the July 15th meeting had laid the groundwork for "possible future agreement" on the Canadian licensing issue, and said that he would like to hear from Pearson if Pearson had "any change in [his] thoughts regarding the Canadian situation."

Several times in the summer or early fall of 1970, Pearson and Williams met privately, and Williams again raised Mannington's claim that it was entitled to expanded foreign sales rights. Pearson indicated that he would not consider granting of additional rights to Mannington until the then pending litigation against Armstrong was settled.

On November 5, 1970, Williams placed a call to Pearson. Pearson was unavailable, and Williams spoke instead with Laughlin.

7. LICENSOR and LICENSEE agree that LICENSEE'S floor coverings identified in Stipulated Facts 55 through 75 of Appendix A of the Final Pretrial Order in the CONGOLEUM INFRINGEMENT LITIGATION shall bear at this time the royalty rate stated in paragraph 5, and LICENSOR agrees that LICENSEE may continue to make, use and sell such floor coverings pursuant to the provisions of this Agreement and LICENSOR covenants not to sue LICENSEE with respect to the manufacture, use or sale of such floor coverings or LICENSEE'S customers with respect to the use or resale of such floor coverings, provided that a royalty is paid to LICENSOR under the terms of this agreement for such floor coverings.

Williams told Laughlin that he had just lost one Canadian distributor, and that he was expecting a visit that day from another distributor whose business he wanted to keep. He asked if Congoleum would alter its refusal to grant Mannington license rights in Canada. Laughlin suggested that Mannington offer to pay a higher royalty rate on its Candian sales. Williams then indicated that Mannington would have to go ahead and sell in Canada. Laughlin responded that it was okay with him, but obliquely implied that Congoleum would sue for infringement and would not give Mannington any priority with respect to such litigation. A contemporaneous memorandum by Williams describes his conversation with Laughlin as follows: "a licensing agreement will be reached between Congoleum Industries and the Armstrong Cork Company, and because of our poor position in Canada, Dick Laughlin has agreed to more-or-less close his eyes to any transactions we have in the meantime in Canada."

Subsequently, Williams reported the substance of the November 5 conversation to Cifelli, who called Laughlin to inquire if Congoleum had changed its position with respect to expanded foreign sales rights. Laughlin indicated it had not. In January 1971, Williams met with Pearson and renewed his request for expanded foreign sales rights. Pearson reiterated his position that he would not grant additional rights during the pendency of the Armstrong litigation, but stated that he believed that settlement was imminent.

In November or December 1970, Mannington recommenced sales in Canada. In its quarterly royalty report to Congoleum made in February 1971, Mannington disclosed royalties of $7,098 generated from sales for shipment to Canada at the premium rate of six and one-half percent, and it tendered payment in that amount. By letter of February 25, 1971, Pearson wrote to Williams to inform him that the one and one-half percent royalty premium paid on Canadian sales would be returned. Pearson stated:

We have no present plan to grant any additional licenses for sale in Canada under our chemical embossing patents. In view of this, I am instructing our Treasurer to refund to Mannington Mills, Inc. the amount of Mannington's recent royalty payment in excess of five percent.

As indicated to you previously, we have this matter under continuous consideration and if there is any change in the policy, we will be in touch with you.

Congoleum subsequently returned the royalty premium to Mannington. Thereafter, Mannington reduced the royalty paid on Canadian sales to five percent, but until July, 1972 it continued to report Canadian sales separately.

During 1971, in accord with the License Agreement, the accounting firm of Arthur · Andersen & Co., acting as agent for Congoleum, reviewed Mannington's records. Arthur Andersen's report to Congoleum dated May 13, 1971, stated that: "We were informed by Mannington personnel that Mannington is presently negotiating to obtain the right to sell license products in certain foreign jurisdictions, however, the License Agreement has not been amended." This comment was cleared by Mannington. The worksheets of the Arthur Andersen accountant responsible for the review also contain a report of a discussion with Mannington's comptroller, as follows: "Amendment to agreement not clear on sales to foreign customers. Mannington wants right to sell foreign[;] Congol. has not said yes or no—for this minor amt Mannington felt better to pay 6½% (old rate). Per [Mannington's comptroller] Congoleum later returned check and agreed to accept 5%. . . . ."

After the execution of the Letter Agreement in May 1968, and despite the fact that it was not formally licensed to do so, Mannington continued to sell the patented product through distributors in Australia and New Zealand. Congoleum learned of Mannington's Australian sales in 1969, and its New Zealand activities in 1970. Although Mannington had ceased to sell in Canada as part of the 1968 settlement negotiations, it recommenced sales there with Congoleum's

knowledge in November or December 1970. In addition, Mannington commenced sales in Japan in 1972. Congoleum learned of these activities in the same year. Congoleum took no action against Mannington's infringing foreign sales until July 1974.

By letter of July 25, 1974, Congoleum notified Mannington of its intent to terminate the Letter Agreement, effective January 31, 1975, and thereby to revoke all Mannington's foreign license rights. Further, Congoleum advised Mannington that it was aware that Mannington was selling in countries not covered by the Letter Agreement and that commencing September 1, 1974, it would take action to protect its patent rights in those countries. The district court found that Congoleum cancelled Mannington's foreign license rights because of the receipt of increasing numbers of complaints about Mannington's infringing conduct from its licensees, and because Congoleum feared that those licensees would commence to sell in areas where they were not licensed if Mannington were permitted to infringe with impunity. Congoleum now has infringement actions pending against Mannington in Canada, New Zealand, Australia, and Japan.[8]

The original patent infringement action by Congoleum against Armstrong Cork was decided in Congoleum's favor in February 1972.[9] Two related trials involved patent misuses and the use of a new chemical in the embossing process took place in 1973 and 1974.[10] Appeals of the trial on the infringement questions extended to early 1975.[11] In March 1976, on the eve of a trial on damages, a settlement was reached whereby Armstrong paid $35 million in damages and accepted an injunction. No license was ever issued to Armstrong.

8. *See Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1290 (3d Cir. 1979).

9. *Congoleum Indus., Inc. v. Armstrong Cork Co.*, 339 F.Supp. 1036 (E.D.Pa.1972) (upholding the validity of Congoleum's U.S. Patents).

10. *Armstrong Cork Co. v. Congoleum Indus., Inc.*, 399 F.Supp. 1141 (E.D.Pa.1975) (declaratory judgment that Armstrong's process using a new chemical infringes on the U.S. Patents).

## II. PROCEEDINGS BELOW

Mannington brought this suit in October 1974, seeking declaratory and injunctive relief to compel the continuation of its foreign license agreement with Congoleum, as well as license rights in the six additional foreign countries in which license rights had been granted to GAF. The plaintiffs relied alternatively upon: (1) the most favored licensee clause of the License Agreement; (2) an alleged oral license from Congoleum to Mannington; (3) a license "implied in fact" from the conduct of the parties; (4) a license by estoppel; and (5) §§ 2 and 7 of the Sherman Act.

The district court ordered the severance of the license and antitrust claims for purposes of discovery and trial. The parties had extensive discovery and a full trial to the court on the license claims. On November 11, 1977, the district court entered an order denying plaintiff's contractual and equitable claims to license rights in all respects, and granting an interlocutory declaratory judgment on the license claims in favor of Congoleum.

On January 30, 1978, Mannington filed an amended antitrust complaint, which renewed its request for injunctive relief and for the first time sought treble damages for violations of §§ 1 and 2 of the Sherman Act. Several separate violations were alleged. On January 13, 1978, Mannington commenced discovery on the antitrust issues by serving on Congoleum written interrogatories and requests for production of documents. These documents focused on the relationship between Congoleum and its foreign licensees. On February 17, 1978, Congoleum objected to most of the requests as irrelevant. A motion to compel dis-

*Congoleum Indus., Inc. v. Armstrong Cork Co.*, 366 F.Supp. 220 (E.D.Pa.1973) (denying motion to reopen record to consider evidence of new embossing technique, and finding that Congoleum had not misused its patents).

11. *Congoleum Indus., Inc. v. Armstrong Cork Co.*, 510 F.2d 334 (3d Cir.), *cert. denied*, 421 U.S. 988, 95 S.Ct. 1991, 44 L.Ed.2d 478 (1975).

covery was filed on March 9, and was granted on March 27, 1978. In April 1978, Congoleum turned over some 8,000 documents to Mannington. On April 24, at a pretrial hearing, the district court directed Mannington to proceed with discovery on the antitrust claim.

On May 11, 1978, Mannington filed notices to take depositions on the antitrust issues from ten present or former officers and employees of Congoleum, seven of whom had been deposed during the license phase of the case. Congoleum moved on May 12 for a protective order as to those seven, arguing that Mannington had had full discovery as to them during the license phase of the case. On May 15, Congoleum moved for summary judgment on Mannington's antitrust claims. Mannington and Congoleum agreed to postpone the hearing on the motion for a protective order until after the district court had ruled on the summary judgment motion.

On July 24, 1978, after a hearing, the district court, after oral argument, granted Congoleum's motion for summary judgment in its entirety, thus mooting Congoleum's pending motion for a protective order. Judgment was entered on all claims on August 29, 1978, and this appeal followed.

### III.

#### A. *The License Claims*

On appeal, Mannington first contends that under the most favored licensee clause of the License Agreement it is entitled to the more favorable foreign sales rights contained in Congoleum's subsequent license to GAF. Specifically, Mannington claims that it has the right to sell in the six additional nations where GAF was licensed to sell and that its foreign licenses, like those granted to GAF, should be terminable only for cause.

The district court rejected this contention on two grounds. First, it held that the License Agreement and the Letter Agree-

ment were not "integrated" documents, and that the License Agreement's most favored licensee clause therefore could not apply to the foreign sales rights granted in the Letter Agreement. Alternatively, it held that because the scope of the most favored licensee clause is limited to the terms of licenses which were granted under Congoleum's United States patents, the clause did not extend to GAF's foreign sales licenses, which were granted under Congoleum's foreign patents. Because it felt that the meaning of the agreement was clear, the court refused to consider extrinsic evidence of the parties' intent.

 We think that the district court was in error in concluding that the License Agreement and Letter Agreement could not be read together as a single instrument. The two documents were negotiated and executed simultaneously as part of the settlement of a single litigation. The Letter Agreement makes explicit reference to the terms of the License Agreement. Moreover, the subject matter of the agreements, while not identical, is closely related. On several important issues, the Letter Agreement is unintelligible without reference to the License Agreement, which contains the royalty provisions applicable to both domestic and foreign licenses, as well as the definition of "Licensed Products" applicable to both agreements. These instruments therefore fall within the rule that where separate writings are made as part of a single transaction relating to the same subject matter, they may be read together as one agreement.[12] *Schlossman's, Inc. v. Radcliffe,* 3 N.J. 430, 435, 70 A.2d 493, 495 (1950); *General Elec. Credit Corp. v. Castiglione,* 142 N.J.Super. 90, 360 A.2d 418, 424 (LawDiv.1976). Moreover, given the strong indications of interdependence between the two documents, the absence of an express incorporation clause is not decisive. *American Express Co. v. Rona Travel Service, Inc.,* 77 N.J.Super. 566, 187 A.2d 206 (Ch. Div.1962).

---

**12.** The License Agreement expressly provides that New York law governs the construction and interpretation of the agreement. The par-

ties have stipulated, however, that New York and New Jersey law are identical on all issues relevant to this appeal.

Even if the two agreements are read together, however, it is evident that the rights granted by Paragraph 16 of the License Agreement do not extend to the terms of the foreign licenses granted in GAF's License Agreement. Paragraph 16 entitles Mannington to most favored licensee treatment only with respect to licenses granted to a third party "under one or more of the PATENT RIGHTS." Those patent rights are expressly defined in the Agreement as rights under Congoleum's United States patents. The protections of the most favored licensee clause thus extend to the terms of the foreign sales licenses granted to GAF only if those licenses can in any meaningful sense be said to have been granted "under" Congoleum's United States patents. It is clear that they cannot. Congoleum's United States patents give it no legal power to limit foreign manufacture, use or sale of the patented products. *See Deepsouth Packing Co. v. Laitram,* 406 U.S. 518, 524, 531, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972). The power to grant restrictive foreign sales licenses to GAF must therefore flow from Congoleum's legal right as patentee to limit the manufacture, use, and sale of the patented product in the country of license. Thus the foreign sales licenses granted to GAF can only have been granted "under" Congoleum's foreign patents, and the most favored licensee clause does not extend to them.

In an effort to create an ambiguity, Mannington argues that, as a practical matter, GAF's right to sell arises at least in part under the United States patents, since it is under those patents that GAF's domestic manufacturing license was issued. Without a domestic license to manufacture, Mannington argues, GAF would have no product to sell in those foreign countries where it was licensed under the Letter Agreement. Therefore, it argues, GAF's foreign sales rights must arise under the United States patents. This contention is factually unfounded, since GAF is licensed to manufacture under Congoleum's foreign patents as well, and therefore need not depend on its United States manufacturing rights for access to the patented products. But even

if Congoleum were able, as a practical matter, to prevent the foreign sale of the patented product by terminating GAF's domestic license agreement, that fact would not be decisive. For Paragraph 16 makes the relevant consideration not the source of the licensee's supply of the patented product, but the source of Congoleum's power to grant the license. In the case of GAF's foreign licenses, that power can only have arisen under the foreign patents.

Mannington next contends that under the most favored licensee clause it is entitled to the benefits of Paragraph 13(b) of the GAF License. That Paragraph provides, in pertinent part:

> LICENSOR agrees that licensee may continue to make, use and sell such floor coverings pursuant to the provision of this agreement, and LICENSOR covenants not to sue LICENSEE with respect to the manufacture, use or sale of such floor coverings or LICENSEE'S customers with respect to the use or resale of such floor coverings, provided that a royalty is paid to LICENSOR under the terms of this agreement for such floor coverings.

Mannington reads this covenant not to sue as conferring upon GAF, and upon GAF's customers, freedom to sell the patented product in any foreign country without fear of an infringement action whether or not GAF is licensed to sell in that country. Extension of this right to Mannington and its customers would, it argues, entitle it to continued foreign sales rights. As the district court pointed out, however, the covenant not to sue applies only to sales made "pursuant to the provision of the agreement." It must be construed as subject to, and no broader than, the express grant of domestic and foreign sales rights in Paragraphs 4(a) and 4(b) of the GAF License. Thus it cannot be read as establishing the principle that sales in violation of the license agreement are not subject to an infringement action, and Mannington may not claim the benefit of that principle under Paragraph 16, even with respect to its domestic licenses. Moreover, as we noted

above, insofar as the protections of Paragraph 13(b) extend to sales made pursuant to sales licensees granted "under" foreign patents, Paragraph 16 is in any event inapplicable. GAF's covenant not to sue therefore cannot be read to authorize foreign sales by Mannington or its customers in countries where it is not licensed to sell.

■ Mannington also argues that Congoleum's conduct gave rise to an irrevocable license by estoppel to sell in all foreign countries license to GAF. Congoleum counters that the doctrine of license by estoppel is inapplicable to licenses granted under foreign patents, which should be governed by foreign law. The district court did not determine the applicability of foreign law to the estoppel claim because it concluded that even under domestic law Mannington was entitled to no relief. We agree.

In order to establish a license by estoppel, Mannington was required to prove four elements:

(1) infringement;

(2) knowledge by the patent owner of the infringement;

(3) conduct of the patent owner which misleads the infringer into believing that the patent owner has abandoned his patent or acquiesced in the infringement; and

(4) reliance by the infringer on such conduct.

*Minnesota Mining & Mfg. Co. v. Berwick Indus., Inc.,* 373 F.Supp. 851, 869 (M.D.Pa. 1974), *aff'd,* 532 F.2d 330 (3d Cir. 1976). After trial, the district judge ruled that Mannington had failed to prove that it was at any time actually misled into believing that Congoleum had abandoned its patent or acquiesced in its infringement by Mannington. He therefore declined to determine whether the other three elements of an estoppel were present.

[5] There is ample record evidence to support the conclusion that Mannington was at all times aware that Congoleum had not abandoned its patent. Between May 1970, and mid-1971, Mannington on numerous occasions sought expanded foreign license rights. Each time it was rebuffed

by Congoleum. The text of the July 17, 1970, License Amendment Agreement, the cover letter to that agreement, Williams' internal memorandum of November 5, and the Arthur Andersen report and worksheets all indicate that Mannington was aware that Congoleum had not acceded to its request for increased foreign license rights, and that it did not intend to entertain Mannington's request for extended rights until after the conclusion of the Armstrong litigation.

■ On this appeal, Mannington concedes that the district court's findings are sufficient to support the conclusion that Mannington never believed that Congoleum had "abandoned" its patents. But it argues that those findings will not support its further holding that Mannington did not believe that Congoleum had "acquiesced" in Mannington's infringement. Mannington relies principally upon Congoleum's failure to bring an infringement action against it until July 1974, more than four years after Congoleum first learned of Mannington's infringing sales. But it is undisputed that until 1976 Congoleum was engaged in a series of infringement actions against Armstrong. The general rule is that a patentee has no duty to bring an action against an alleged infringer during the pendency of another infringement action on the same patent, and that when the infringer has notice of the pending action, he may not rely upon any resulting delay as a basis for a claim of estoppel. *Advanced Hydraulics, Inc. v. Otis Elevator Co.,* 525 F.2d 477, 482 (7th Cir.), *cert. denied,* 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 99 (1975); *CF. Minnesota Mining & Mfg. Co. v. Berwick Indus., Inc.,* 532 F.2d at 334 (laches). Mannington's conceded awareness of the Armstrong litigation was sufficient to put it on notice that Congoleum had not acquiesced in its infringing conduct.

### B. The Antitrust Claims

■ Mannington advances two antitrust claims on appeal. The first is that, while Congoleum's foreign manufacturing licen-

sees regularly were invited to purchase know-how with their manufacturing license, Congoleum arbitrarily and unreasonably refused to sell to Mannington certain unpatented know-how relevant to the manufacture of the patented product. We seriously doubt that an arbitrary or discriminatory unilateral refusal to deal by a lawful monopolist is actionable under § 2 of the Sherman Act. *See* 3 P. Areeda & D. Turner, Antitrust Law ¶ 736 (1978). We need not decide that issue here, however, for the summary judgment record demonstrates that Congoleum's refusal to license know-how to Mannington was not arbitrary. None of the foreign manufacturing licensees who received know-how had any prior manufacturing experience at the time that their know-how licenses were issued. In contrast, Mannington, like GAF, had been manufacturing the patented product for a number of years prior to its acceptance of a Congoleum license. There was thus a substantial and undisputed difference between Mannington and those foreign licensees who received know-how with their manufacturing licenses. Mannington's claim that Congoleum's denial of know-how was arbitrary or unreasonable therefore fails.

Mannington's conspiracy claim requires closer scrutiny. As stated in the complaint, that claim is that Congoleum conspired with one or more of its foreign licensees to cancel Mannington's foreign sales licenses. As spelled out in greater detail at hearings in the district court,[13] the claim was (1) certain of Congoleum's foreign licensees had complained about Mannington's excessive competition and had threatened to terminate their own licenses unless Mannington's foreign licenses were revoked, and (2) that in response to that threat, Congoleum had agreed to terminate Mannington's foreign licenses.

The district judge granted summary judgment, ruling that the plaintiff's complaint did not state a claim under § 1 of the Sherman Act and that the summary judgment record did not contain evidence sufficient to create a material issue of fact as to the existence of a conspiracy.[14]

The lower court's holding that a valid antitrust claim had not been stated was based exclusively upon Congoleum's status as a patentee. The court stated that "[a] patentee may grant one, many, or no licenses under its patent," and may, if it chooses, "grant . . . an exclusive license—effectively an agreement not to license any competitors under the patent," without violating the Sherman Act. While noting the absence of any case directly on point, the district judge apparently reasoned that this policy of deference to a patentee's licensing decisions should extend to protect the termination of a licensee undertaken at the request of a competing licensee or licensees.

■ We recognize that promotion of the policies that underlie the federal patent laws may on occasion require that the appli-

---

**13.** THE COURT: I have five licensees out each with six months or 90 days termination clauses exercisable at mutual option or my option. Four guys come to me and say that this guy Jones is killing us, you've got to get him out of the market or we are going to have to stop making widgets and go into growing peaches. And you are making more money off the four of us than off of him because he's cheaper, undersells some way.

I say to you, today I will shut him off and I turn the faucet.

You have any real problem with that?

[COUNSEL FOR CONGOLEUM]: That may well be a violation.

THE COURT: Off the top of my head I don't have any problem with that. That's what Mr. Bain alleges you did with respect to the 22 foreign countries.

Am I right?

[COUNSEL FOR MANNINGTON]: That's correct.

THE COURT: I'm glad I finally understand what the plaintiff is claiming.

**14.** The district court's holding that Mannington's conspiracy claim failed as a matter of law would, if correct, provide an independent ground for affirming the judgment below. Thus the concurring opinion's suggestion that our discussion of the antitrust issue is advisory is incorrect. To the contrary, unless we were to decide the antitrust issue, our decision of the discovery issue would violate the settled principle that a federal court is not normally empowered to declare, for the government of future cases, principles or rules of law which cannot affect the result in the case before it.

cation of normal antitrust principles to patent license restrictions be moderated or withheld entirely. On the facts alleged in this case, however, we think that the antitrust exemption created by the district court extends more broadly than is necessary to that end. We conclude that the complaint stated a cause of action under the Sherman Act.

We start with the settled proposition that when a non-patentee manufacturer agrees with one or more of its dealers or distributors to terminate a competing distributor, that agreement is subject to antitrust scrutiny. *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979). As we pointed out in *Cernuto*, dealer inspired terminations may pose serious anticompetitive risks not presented by a manufacturer's unilateral refusal to deal:

> When a marketing decision, although ostensibly taken by a manufacturer, is in fact the result of pressure from another customer, such a decision must be scrutinized more closely than solely unilateral action might be. . . . When a manufacturer acts on its own, in pursuing its own market strategy, it is seeking to compete with other manufacturers by imposing what may be defended as reasonable vertical restraints. . . . However, if the action of a manufacturer or other supplier is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier. Therefore, although the termination in such a situation is, itself, a ·vertical restraint, the desired impact is horizontal and on the dealer, not the manufacturer, level.

595 F.2d at 168. Where the purpose and effect of such a termination is to fix prices, *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d at 168–69, or to enforce a group boycott, *United States v. General Motors Corp.*, 384 U.S. at 145, 86 S.Ct. 1321, the agreement is *per se* illegal. In other cases rule of reason analysis may be appropriate. *Com-*

*pare Cernuto*, 595 F.2d at 168–69 *with Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir.) (*en banc*), cert. denied, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). *See also Harold Friedman, Inc. v. Thorofare Markets, Inc.*, 587 F.2d 127, 142 (3d Cir. 1978).

The issue then is whether Congoleum's status as a patent monopolist immunizes this otherwise actionable conduct from antitrust attack. Resolution of that question requires us to weigh the potential injury to competition from conduct of the kind alleged by Mannington against the risk that the application of antitrust sanctions will frustrate the purposes of the patent system. Our analysis suggests that application of antitrust principles to this conduct would materially encourage competition without posing any serious threat to patent policy.

The grant of a patent of invention confers upon the successful patentee "the right to exclude others from making, using, or selling the invention throughout the United States" for a term of seventeen years. 35 U.S.C. § 154. The purpose of that grant of a limited monopoly is to provide an incentive for private enterprise to devote resources to innovative research, to make the investments required to put new inventions into practice, and to make the benefits of the invention available to a wider public. *See* P. Areeda, Antitrust Analysis ¶ 403 (2d ed. 1974); Turner, *The Patent System and Competitive Policy*, 44 N.Y.U.L.Rev. 450, 451–54 (1969).

Vertical restrictions imposed upon licensees by a patentee, like those imposed by a non-patentee upon its distributors, may often be useful, and perhaps even essential, to the patentee's effort to maximize the monopoly income to which the patent grant entitles him. *See* W. Bowman, Patent and Antitrust Law: A Legal and Economic Appraisal 54–57 (1973); Baxter, *Legal Restrictions on Exploitation of the Patent Monopoly: An Economic Analysis*, 76 Yale L.J. 267, 313 (1966). It might therefore be argued that to encourage inventive activity all anticompetitive license restrictions which

increase the patentee's net income should be immunized from antitrust scrutiny. But there is a consensus among those who have considered the question that, in view of the substantial uncertainties inherent in the process of developing and patenting a new invention, any incremental increase in patentee income that might result from permitting licensing schemes that would otherwise violate the antitrust laws would be unlikely to effect a patentee's initial decision to invest in innovative activity. P. Areeda, *supra*, ¶ 404(f) at 429; Turner, *supra*, 44 N.Y.U.L.Rev. at 458–60, 463; Gibbons, *Price Fixing in Patent Licenses and the Antitrust Law*, 51 U.Va.L.Rev. 273, 276–77 (1965); Furth, *Price-Restrictive Patent Licenses Under the Sherman Act*, 71 Harv.L.Rev. 815, 829 & n.35 (1958).

Perhaps more persuasively, it has been argued that overly restrictive antitrust review of patentee licensing practices might lead a patentee to license less widely than he might otherwise do, or indeed, not to license at all. P. Areeda, *supra*, ¶ 411; L. Sullivan, Antitrust ¶ 183 (1977); Turner, *supra*, 44 N.Y.U.L.Rev. at 463–64; Gibbons, *Domestic Territorial Restrictions in Patent Transactions and the Antitrust Laws*, 34 Geo.Wash.L.Rev. 893, 894–95 (1965); Furth, *supra*, 71 Harv.L.Rev. at 830. *But cf.* Baxter, *supra*, 76 Yale L.J. at 352–53. Less widespread licensing could lead to decreased use of the patented product, less present competition for the patentee, and reduced competition in the patented product after the expiration of the patent. L. Sullivan, *supra*; Turner, *supra*, 44 N.Y.U.L. Rev. at 464. Exclusive licenses, the type of restrictive arrangement relied upon by the district court, have been defended on this ground. *See* P. Areeda, *supra*, ¶ 411 at 447 n.76. It would appear that neither patent nor antitrust policy would in the long run be served by prohibiting restrictions necessary to promote wider use of the patented product.

But restrictive licensing practices may also have significant anticompetitive effects. Some licensing policies may serve as a mask for collusive conduct on the part of competing licensees. In such cases, important antitrust policies may be threatened. *See Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852 (1940); *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); L. Sullivan, *supra*, ¶ 184; Turner, *supra*, 44 N.Y.U.L.Rev. at 450; Furth, *supra*, 71 Harv.L.Rev. at 830–33; *cf.* Buxbaum, *Restrictions Inherent in the Patent Monopoly; A Comparative Critique*, 113 U.Pa.L.Rev. 633, 648–51 (1965). Where the license restriction results primarily in benefits for the licensees rather than the patentee, the anticompetitive restriction cannot be justified as a subsidy for the patentee's inventive activity. *See* Baxter, *supra*, 76 Yale L.J. at 313–14. In such cases, there is no sound reason to immunize the patentee's conduct from antitrust scrutiny. "[T]he patent statute is not seriously encumbered by prohibiting the misuse of a patent as a cosmetic to cover a cartel." L. Sullivan, *supra*, ¶ 184 at 534.

*Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852 (1940), while not directly in point, illustrates the risks inherent in a patent licensing scheme run for the benefit of licensees. Ethyl held patents on a fluid gasoline additive containing tetraethyl lead. The company licensed gasoline refiners to manufacture and sell gasoline containing the patented product. At the next level of the distribution chain, Ethyl licensed jobbers to sell the patented product. Refiners were allowed to sell gasoline only to jobbers licensed by Ethyl. Ethyl conducted regular inquiries into the "business ethics" of licensed jobbers to determine "whether they [maintained] the marketing prices" prevalent in the industry, 309 U.S. at 454, 60 S.Ct. 852, and discharged those not meeting the required standard. Refiners licensed by Ethyl accounted for 88% of all gasoline refined in the country; 11,000 of 12,000 gasoline jobbers in the nation were Ethyl licensees.

The Court found that "by the leverage of its licensing contracts resting on the fulcrum of its patents, [Ethyl] has built up a combination capable of use, and actually

used, as a means of controlling jobbers' prices and suppressing competition among them." This scheme was invalid under the settled rule barring attempts by the patentee to control the resale price of the patented product. *Bauer & Cie v. O'Donnell*, 229 U.S. 1, 16–18, 33 S.Ct. 616, 57 L.Ed. 1041 (1913).

A second basis for the Court's decision, however, reflects an understanding of the relationship between the patent statute and antitrust policy similar to that outlined above. Justice Stone wrote:

> The extent to which appellant's dominion over the jobbers' business goes beyond its patent monopoly, is emphasized by the circumstances here present that the prices and market practices sought to be established are not those prescribed by appellant-patentee, but by the refiners. Appellant neither owns nor sells the patented fuel nor derives any profit through royalties or otherwise from its sale. It has chosen to exploit its patents by manufacturing the fluid covered by them and by selling that fluid to refiners for use in the manufacture of motor fuel. Such benefits as result from control over the marketing of the treated fuel by the jobbers accrue primarily to the refiners and indirectly to appellant, only in the enjoyment of its monopoly of the fluid secured under another patent. The licensing conditions are thus not used as a means of stimulating the commercial development and financial returns of the patented invention which is licensed, but for the commercial development of the business of the refiners and the exploitation of a second patent monopoly not embraced in the first.

309 U.S. at 458–59, 60 S.Ct. at 626. In short, the Court believed that a principal evil of the restrictive licensing scheme was that it provided little or no reward to the patent monopoly, while permitting non-patentee refiners to benefit from the existence of a retail price cartel. *Cf.* W. Bowman, *supra*, at 186–89. *See also In re Yarn Processing Patent Validity Litigation*, 541 F.2d 1127, 1136 (5th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2976, 53 L.Ed.2d 1094

(1977) (allocation by patentee of royalty benefits to licensee not protected by patent policy); *United States v. American Linen Supply Co.*, 141 F.Supp. 105, 113 (N.D.Ill. 1956).

A second line of cases, more closely in point, illustrates the suspect status of patent license restrictions designed to reduce competition at the licensee level and operated for the benefit of competing licensees. In *United States v. Besser Mfg. Co.*, 96 F.Supp. 304 (E.D.Mich.1951), *aff'd*, 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063 (1952), the patent holders on a concrete block making machine granted licenses to Stearns and Besser, the two dominant firms in the machine manufacturing industry. The licenses provided that no further licenses would be granted under the patents without the consent of both licensees. The court held as follows:

> We believe that the contract under question goes further than is necessary to protect the patent monopoly of Gelbman and Andrus. It may well be that an exclusive license to one party would be valid, but here the patentees have joined hands with the two largest competitors in the industry and by terms of their agreement have virtually made it impossible for others to obtain rights under those patents. The contract even gives Stearns and Besser the power to restrict competition—present and future—by requiring their joint consent before licensing others. It is this combination requiring collective action that primarily invalidates the agreement. We believe it clear that the parties intended this contract to be a means whereby control of the industry could be acquired and competition eliminated. For what other reason would Besser or Stearns want the consent of the other before approving a licensee suggested by the patentees? And where it is apparent, as it is here, that the contract is to eliminate competition, it must be held illegal.

96 F.Supp. at 311. *Accord, United States v. Krasnov*, 143 F.Supp. 184, 199–202 (E.D.Pa. 1956), *aff'd*, 355 U.S. 5, 78 S.Ct. 34, 2

L.Ed.2d 21 (1957); *United States v. Singer Mfg. Co.*, 205 F.Supp. 394, 430 (S.D.N.Y. 1962), *rev'd on other grounds*, 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963) (dictum) ("The Court has clearly condemned a restriction requiring the consent of the non-exclusive licensee before the patentee may grant a license to another."); Frost, *Restrictions on Fields of Use and Territories*, 42 Antitrust L.J. 633, 636–37 (1973).

◼ Applying these principles, we think that a patentee's termination of a licensee, in concert with competing licensees, is not entitled to an antitrust exemption. Where a patentee's license restrictions are imposed vertically upon the licensee, in pursuit of the patentee's own marketing strategy, that circumstance suggests that the patentee's licensing decision is in fact directed toward the legitimate exploitation of the patent monopoly. *Cf. Cernuto,* 595 F.2d at 168. By parity of reasoning, it also may be taken as indicating that the restrictions thus imposed are among those significant to the patentee's initial decision whether to license the manufacture or sale of the patented invention. Where the patentee's anticompetitive conduct is undertaken after a number of non-exclusive licenses have been granted and in concert with competing licensees, however, there is a greater risk that the restriction is designed not to reward the patent monopoly, but to increase the licensee's reward. Similarly, the risk that the patentee's power is being used to assist in the policing of a horizontal agreement among licensees is sharply increased. *Id.; United States v. Besser Mfg. Co.,* 96 F.Supp. at 311. As *Ethyl* and *Besser Manufacturing* demonstrate, the patent system has no interest in permitting the patentee's monopoly to be used as a screen for the maintenance of a horizontal cartel at the licensee level. We think, in contrast, that the likelihood that antitrust regulation of such terminations will impair the monopolist's legitimate reward or lead him to license more restrictively is remote.

Because the threat to antitrust policies is substantial, and the likelihood of injury to patent policy remote, we conclude that the fact that Congoleum is a patentee does not justify a special antitrust exemption for the conduct alleged here. On this scant record, we express no view on whether this case should be judged by the rule of reason or by a *per se* rule. That determination should await fuller development of the evidence on remand. Finally, we express no view on the possible interaction between foreign patent policy and the extraterritorial application of the American antitrust laws. *See Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287 (3d Cir. 1979).

The district judge also ruled that the record contained insufficient evidence of a conspiracy to survive a summary judgment motion. While Mannington contests that holding on appeal, we think that on the record before the court that ruling was correct, since the materials filed in opposition to the motion did not show a material issue of fact as to the existence of a conspiracy.

◼ Mannington also argues, however, that the district judge acted prematurely by ruling on the summary judgment motion before Mannington had had fair opportunity to depose the officers and employees of Congoleum regarding the existence of an agreement between Congoleum and its licensees. We agree. Summary judgment in antitrust cases is not favored. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d at 165 & n.2. It follows that the grant of summary judgment before an antitrust plaintiff has been given a full opportunity for discovery on his claim may be reversible error. *See First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290–98, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

Congoleum suggests that the failure to permit Mannington to depose its officers on the antitrust issue was, in effect, harmless error, since Mannington was collaterally estopped by the district court's findings in the license case from relitigating the issue of the reasons for the license termination. There, it will be recalled, the court found

that the termination had been undertaken unilaterally by Congoleum to prevent a revolt by its European licensees. The district court correctly rejected this argument, holding that since the reason for the license termination was not "fully litigated and necessary to the judgment" in the license action, his findings there did not collaterally estop Mannington from claiming that a conspiracy had occurred. *Haize v. Hanover Ins. Co*, 536 F.2d 576, 579 (3d Cir. 1976); Restatement (Second) of Judgments § 68 and Comment c. (Tent.Draft No. 1, 1973). The district court then ruled, however, that "the discovery and trial cross examination during the license phase of this litigation was conducted with sufficient motivation to determine the circumstances of that cancellation that that record may be considered on summary judgment." In our view, that conclusion amounted to an acceptance of Congoleum's collateral estoppel argument in a different form. If the conspiracy issue was not litigated or necessary to the judgment in the earlier action, there was no incentive to conduct full discovery on that issue. Moreover, in view of the bifurcation of discovery on the antitrust and licensing claims, it would appear that Congoleum might successfully have resisted discovery on the antitrust issues during the first phase of the case. We therefore reject the trial court's view that the discovery afforded Mannington in the license phase of the case was adequate to permit resolution on summary judgment of Mannington's antitrust claims.

■ Congoleum also contends that Mannington waived its right to discovery on the antitrust claims by failing to pursue discovery when it had an opportunity to do so. But the events in the district court show no dilatory conduct on Mannington's part. Mannington first sought the documents relevant to its conspiracy claim (and necessary, as well, to effective deposition of the alleged conspirators) on January 13, 1978. Congoleum strenuously resisted the request for documents, and did not turn them over until mid-April 1978, after the court had ordered their production. After obtaining the permission of the judge to proceed with discovery on the conspiracy claim, Mannington noticed the depositions of the ten Congoleum officials on May 11. As to seven of these officers, that request was immediately opposed by a motion for a protective order. Simultaneously, Congoleum filed its motion for summary judgment.

As evidence of dilatory conduct, Congoleum points to Mannington's agreement to postpone the hearing on the issuance of the protective order until the July 24, 1978 hearing on the motion for summary judgment, and its failure to depose the three officers for whom protective orders were not sought during the period between May 15 and July 24. So far as appears, the postponement of the hearing on the motion for a protective order until July 24 avoided an extra hearing day and allowed simultaneous briefing of the relevant issues, thus working to the advantage of the court and the litigants. Until the court ruled on that motion, Mannington was barred from proceeding with any discovery against the seven officers and employees of the defendant who had been directly responsible for the defendant's licensing program during the period at issue, and whose testimony was therefore most important in determining the circumstances of the termination. Moreover, given the large number of claims pressed by Mannington, and the relationship between the scope of the claims asserted and the scope and expense of discovery, Mannington was surely justified in deciding to postpone further discovery of the three more peripheral figures as to whom no order was sought until the district judge had pared down the case by ruling on the motion for summary judgment. Under these circumstances, Mannington cannot be said to have waived its right to discovery on the antitrust claim.

Since Mannington's alleged conspiracy cause of action states a valid antitrust claim, and since it has been denied the opportunity for full discovery on that charge, the order granting summary judgment on that claim must be reversed.

## IV. CONCLUSION

The portion of the district court's order dismissing the contractual and equitable claims to foreign patent licenses and the claim alleging a discriminatory denial of know-how will be affirmed. That part of the order which granted summary judgment on plaintiff's alleged antitrust conspiracy is reversed and the cause will be remanded for further proceedings consistent with this opinion.

ALDISERT, Circuit Judge, concurring.

I join the majority opinion except the extensive discussion contained in Part III (B), Maj.Op. at 1069–1073, of whether Mannington stated a valid antitrust claim. The sole issue properly presented in that section is whether the court erred in granting summary judgment on the conspiracy issue. We hold that while the district court did not err in determining that the record before it contained insufficient evidence of a conspiracy to withstand an adverse summary judgment motion, it did err in ruling on the summary judgment motion before Mannington had fair opportunity to depose Congoleum officers and employees on the possible existence of an illegal agreement between Congoleum and its licensees. We reverse only to permit reasonable discovery to go forward.

Until faced with a genuine case or controversy established by a record, I would not meet the question whether an antitrust violation in this case can be made out, notwithstanding the impressive academic commentary relied upon by the majority. To acknowledge the possibility that upon remand appellant *might* be able to find support for its antitrust claim is one thing. It is quite another thing, however, to discuss at great length, on the basis of an incomplete record, what the possible result in this case should be. Unlike the majority, Maj.Op. at 1069 n.14, I think our pronouncement here should be based on specific facts; until we have the facts, any comment which does more than acknowledge the possibility of antitrust violation upon proof of an illegal conspiracy between appellee and its licensees is simply advisory.

Moreover, although I note that summary judgment "should be used sparingly in *complex* antitrust litigation," *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 165 n.2 (3d Cir. 1979) (emphasis added), this does not mean that district judges should hesitate to grant summary judgment in appropriate antitrust cases. The Supreme Court long ago rejected the argument suggesting "that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations. . . ." *First National Bank v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). A plaintiff is never "entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint." *Id.* at 290, 88 S.Ct. at 1593.

Although there is a tendency to wrap antitrust litigation in the tinsel and glitter of esoterica, the governing legal precepts are not too sophisticated; complexities usually emerge only when an innovative plaintiff or government prosecutor contrives a factual pattern to fit a given precept. Thus, over a vigorous dissent by Judge Freedman, this court, in banc, upheld a grant of summary judgment in *Tripoli Co. v. Wella Corp.*, 425 F.2d 932 (3d Cir.), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970). Speaking through Judge Gibbons, we noted that "[e]ven in an antitrust case a party must . . . come forward with affidavits setting forth specific facts showing that there is a genuine issue for trial." *Id.* at 935; *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068, 1080 (3d Cir. 1978).